**Jack M. APPLEBAUM, Individually and d/b/a Applebaum Iron & Metal Company, Appellant,**

v.

**W. G. MICHAELS, Appellee.**

No. 7593.

Court of Civil Appeals of Texas.

Texarkana.

Oct. 13, 1964.

Rehearing Denied Nov. 3, 1964.

Chester Ball, Harris & Ball, Arlington, for appellant.

Franklin Jones, Sr., Franklin Jones, Jr., Jones, Brian, Jones & Baldwin, Marshall, for appellee.

FANNING, Justice.

Plaintiff-appellee sued defendant-appellant for damages for personal injuries and property damage, and medical, hospital, drug, etc., expenses, arising from an automobile-truck collision in the City of Marshall, Texas, on December 13, 1961.

In response to special issues submitted, the jury in the cause found to the effect that the defendant negligently and proximately caused the injuries to plaintiff in these respects: Failing to keep a proper lookout; failing to yield the right of way when the vehicle operated by plaintiff had entered the intersection before the vehicle operated by defendant had reached the north margin of the intersection; in fail-

ing to stop in obedience to a red signal light on the occasion of the wreck; and in driving his automobile at a greater rate of speed than a person of ordinary care would have maintained under the facts and circumstances then existing as defendant entered the intersection in question. The jury by its verdict also acquitted plaintiff of all charges of contributory negligence and also found that the collision was not an unavoidable accident.

Special Issues 4, 5, and 6 and the jury's answers thereto are quoted below:

"SPECIAL ISSUE NO. 4:

"What amount of money, if any, if paid now in cash do you find from a preponderance of the evidence will fairly and reasonably compensate the plaintiff W. G. Michaels for the injuries sustained by him on the occasion of the wreck?

"ANSWER BY STATING THE AMOUNT, IF ANY, IN DOLLARS AND CENTS.

"ANSWER: $17,500.00

"In arriving at you answer to the above question, you may take into consideration the following elements of damages, and none other: The loss of earnings, if any, that the plaintiff has suffered as a proximate result of his injuries from the date they were received to the present time; the loss of earnings and impairment of the plaintiff's capacity to work and earn money, if any, that in reasonable probability will be incurred by the plaintiff in the future as a proximate result of his injuries; the physical and mental pain and suffering, if any, that the plaintiff has undergone as a proximate result of his injuries from the date he was injured to the present; and the mental and physical pain and suffering, if any, you may find that the plaintiff will in reasonable probability suffer in the future as a proximate result of his injuries. And you will

make your answer to the foregoing issue such a sum of money, if any, as will reasonably and fairly compensate the plaintiff for the above elements of damages and none other.

"SPECIAL ISSUE NO. 5:

"What amount of money, if any, do you find from a preponderance of the evidence will fairly compensate the plaintiff W. G. Michaels for medical, hospital, x-ray, laboratory and drug expense, if any, necessarily incurred in the treatment of W. G. Michaels by reason of his injuries?

"ANSWER BY STATING THE AMOUNT, IF ANY.

"ANSWER: $272.48

"SPECIAL ISSUE NO. 6:

"From a preponderance of the evidence what do you find was the reasonable cost in Harrison County, Texas and vicinity of the necessary repairs to the truck being driven by W. G. Michaels immediately following the collision in question, directly caused by said collision?

"ANSWER BY STATING THE AMOUNT.

"ANSWER: $700.00."

The trial court entered judgment for plaintiff upon the verdict of the jury for the amount of damages found by the jury. Defendant has appealed.

Appellant, among other things, contends that there is no evidence of probative force to support the jury's answer to special issue No. 4, that the evidence is insufficient to support said answer, and that the finding of the jury on special issue 4 is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

For a comprehensive discussion of the principles of law applicable to the determination of such character of points see Chief Justice Calvert's article, " 'No Evi-

**150**

dence' and 'Insufficient Evidence' Points of Error", 38 Tex.Law Rev., No. 4, p. 361.

■ Appellant also contends that the amount awarded by the jury ($17,500.00) in response to issue 4 is excessive.

Plaintiff was 63 years old at the time of the collision and had a life expectancy of 14.14 years. Plaintiff's pleading sought damages for personal injuries in excess of $35,000.00; among the elements of damages stated in plaintiff's petition was a claim for damages in the amount of $7,000.00 for past and future pain and suffering, both physical and mental. Appellee's version of the facts relative to the personal injury damages of plaintiff are set out in appellee's brief, and with only slight amendments to remove references to the record, is quoted in part as found below.[1]

1. "When the collision occurred, the appellee was thrown into the windshield so as to cut a two or three-inch gash in his forehead, inflict lacerations on his arm and side. Before the ambulance arrived, he was bleeding 'awful bad' on his forehead, but his arm was the main thing hurting him, because 'of course, it was tore aloose, those ligaments', and although he was hurting all over, the arm seemed to be the worst. On arrival at the Emergency Room at the hospital, he could not be laid down on account of his arm and suffered pain while sitting up, waiting for the doctor some twenty minutes. His pain was so severe that they were able to get only one x-ray at a time after he was taken from the Emergency Room to his room, where he was in such severe pain that he was given a shot, and on coming around, found himself all bandaged up, bandages or a cast having been put on in his room. The pain was of a burning nature, feeling something had been torn aloose in appellee's arm, so that he thought a bone had been broken, and he could not observe his shoulder, because it was hurting him so bad, he was just hanging onto it.

"He had to lay either on his back or left side, and could not move his right side at all, which occasioned pain during the eight days he was in the hospital. For forty-five to sixty days after leaving the hospital, he did nothing, notwithstanding the sixty days following the date of his injuries was the best time of the year that he had in his implement business, since farmers were buying tractors and equipment then, and would come in and talk and figure out what they were going to trade, etc. Indeed, one might say that during January and February and the last of December, what was done in his business would depend on how good it would be for the coming year, and he 'just didn't have no business' while he was off. To the question of what he had averaged over the period from the last of December and sixty days from the 13th of December in years prior to his injury, the witness responded that one had to figure it as if no business was there if he was not, and that the men were being paid, too, which would cause one to figure that a man would make $1,000.00 a month, and if he didn't make it during the months that were good, he sure couldn't make any during the months that he wasn't doing anything, so he figured $1,000.00 a month that he lost every month that he was gone.

"On returning from the hospital, he continued to suffer with his arm and shoulder, to the extent that he could not sleep at night, could not turn on his right side, and in the night when he would do so, he would lose lots of sleep during the time from suffering. The arm was in a bandage for forty-five days when he couldn't move it, and after it was taken off, he could move it only a third of the way that he formerly could, which sure interfered with his carrying on his business and work. The injuries were such that he couldn't pick up anything if he was in the shop working or something like that, and naturally, one couldn't work on tractors or do anything without using one's arms, which 'purt near' caused him to stay out of there until his arm got to where he could use it a little bit.

"In his business, he did not give up the mechanical work, but followed it on through, and when he sold in a territory, he serviced therein, and always checked a tractor and did what it needed, rather than hiring or bringing out a mechanic. The injury to his shoulder made a difference in that kind of work, since he just couldn't do it, and when he sold a man and tried to set up a piece of equipment, he had to show him how, or try and show him how to do it himself, because he couldn't do it, finding that every time he used his arm, he ran into trouble. This caused him to have to send a mechanic out. The appellee has never gotten to where he could do the work he did before he was hurt, and which would

■ Recovery may be had for future physical pain and suffering if the evidence shows that there is a reasonable probability of such consequences. 13 Tex.

require the free use of his right shoulder.

"He has noticed a change in his ability to drive in the nature of a hurting on the front side of his shoulder and up on top, and after he drives eight or ten miles, he would have to get his arm off of the steering wheel, kind of lay it down on his knee or anywhere like that, which is the only way he could get any ease. The motion in his arm and shoulder, as compared with what it was before his injury, has been restricted about a third, it beginning to hurt him after he gets it about two-thirds of the way up, and although he could force it up against pain, he obeys the signal when it goes to hurting and stops in an effort not to abuse his arm, which has caused a loss of about a third of the use. In fact, the pain in the arm has been such that one day, he might work with it without abusing the arm and shoulder and getting pain, the next day, he could not, in accordance with what he was doing.

"Before the appellee was injured, he had no idea of selling his business or retiring before seventy years of age, in fact, not having thought about retiring at all, since he had been healthy all of his life and was healthy and active. He emphatically testified he would not have traded his business for the lawsuit, and did not have in mind going out of business, and if he could do what he used to could do, he would still 'love to have the business'. Nevertheless, when he found out that he could not run the business and do everything that he used to, he put it up for sale, the actual sale of the business taking place October 10, 1962.

"While at the hospital and at home with his injuries, the appellee had to hire a man, indeed, two men, to take care of his cattle, because he had one that could not drive a truck that was the main man and knew how to feed, and he had to hire another man to drive for him and furnish the truck, because appellee's was torn up. From the time he started feeding until he got through, he had to pay $10.00 a day for this service, for one hundred days that he would have been feeding himself, had he not been hurt. Since his injuries, he has not been able to take care of the cattle as he did before he was hurt, but finds that he could feed only a few of them by dragging the bales out and breaking them up with his left arm, but he has been unable to load

the hay and distribute it out where he has more cattle and has always had to have somebody go with him since he was hurt, which by way of a rent-free house he has had to give the helper, has cost him $25.00 a month.

"On cross examination, the appellee reiterated that he was not back in business at all over the first period following his injury; and that although he had, in 1955, had some heart trouble, he had fully recovered before the time of his injuries. He went on to say that he didn't know how much business he lost while he wasn't there, 'because if the boss ain't there, they don't come', and that although the business was open, it was not operating at a profit, that one is going to lose money if he isn't there to run his business.

"The appellee was extensively cross examined about the sale of his business in the fall of 1962, and the fact that the net profit shown on his income tax return for that year showed $6,362.98. He explained that he had actually made less money in 1962, and that the apparent increase in income was due to the fact that John Deere Plow Company, for which he was dealer, had required him to charge off of his inventory various parts and equipment as obsolete, which was still good, and had to be taken into account on the sale, thus indicating a profit which in truth was a gain from restoring the obsolete and charged off properties to inventory. On re-direct examination, greater clarification was given by testimony of the appellee that parts had been thrown out of inventory and written off, and that when the sale was made, Uncle Sam required the payment of income tax on amounts realized from items earlier written off of the inventory.

"Further pursuing the cross examination, the appellee testified that in 1960, he made $4,148.83; in 1961, $4,353.93; and in 1959, $3,327.68. It was established on re-direct examination that up until the business was sold in 1962, the income of the appellee therefrom was off one-third, due to the fact that the appellee had to remain inactive. Both on cross examination and on re-direct, the appellee testified that had he not been injured, he intended to work on as long as he could, because a man stayed younger longer active than he did otherwise.

"The only medical witness was Dr. Philip Crayton, being the physician who treated the plaintiff. His first impression

Jur. p. 474, Sec. 274; Galveston, H. & S. A. Ry. Co. v. Powers, 101 Tex. 161, 105 S.W. 491; St. Louis Southwestern Ry. Co. of Texas v. Garber, Tex.Civ.App., 108 S.W. 742; Gulf, C. & S. F. Ry. Co. v. Harriett, 80 Tex. 73, 15 S.W. 556; Fisher v. Coastal Transport Co., 149 Tex. 224, 230 S.W.2d 522.

■ In Turner v. McKinney, Tex.Civ. App., 182 S.W. 431, 435, wr. ref., after setting out the facts in that particular case, it was held: "We think the evidence above quoted sufficiently shows physical pain and mental suffering up to the time of the trial, and that the plaintiff will probably suffer mental anguish and physical pain in the future. Mental suffering will be implied from illness, or injuries, accompanied by physical pain (citing authorities)."

It was held in Dallas Railway & Terminal Co. v. Davis, Tex.Civ.App., 26 S.W. 2d 340, no writ, that mental and physical pain will be implied with continued illness.

There was amply sufficient evidence of probative force in the record to support an award of $7,000.00 for past and future pain and suffering of plaintiff as a result of the injuries he received in the collision, which amount of $7,000.00 was the amount sought by plaintiff in his petition for pain and suffering, past and future.

In Dallas Consolidated Electric St. Ry. Co. v. Motwiller, 101 Tex. 515, 519, 109 S.W. 918, 921, it is stated:

"The question being whether or not there was any evidence authorizing the submission of the element of damage from impairment of capacity to earn

was that the appellee had suffered a fractured right shoulder and some fractured ribs, but upon x-ray examination, no fractures were discovered, although there was a separation of the right acromioclavicular joint space. The acromion is a process of the scapula, sometimes called the shoulder blade, and makes the end of the humerus, joining together to make the shoulder joint, which is also made up of the collar bone, forming a part of it. It was at this place that the separation appeared. The separation meant a pulling away of the collar bone from the bone it joins, and indeed, there would have to be a pulling away or the joint would not be separated. The joint is a true one, with synovial membrane and all, although it is not as active as the arm or in the glenoid cavity, where the arm is controlled. It does add stability to the shoulder joint, and also to the whole rigid part of the shoulder, such as the shoulder blade and the collar bone.

"The doctor testified that in order for the joint to separate, one would have to assume that there had been tearing or pulling or spraining of the ligaments, or the joint would not open up. The ligaments that would be affected were those that tied the acromio process of the shoulder blade to the collar bone and ligaments that joined the joint together and others that would tie the collar bone down to keep it from flopping or riding free; that there had to be some pulling or stretching or tearing of these ligaments

for the joint to separate, which separation would be in the front as well as in the back.

"One, the doctor said, would have to wait to see the extent of the injury or how severely the ligaments were torn to determine the repair that would occur, although one would not expect as maximum a recovery with a man of the appellee's age as would be expected in younger age divisions. In the opinion of the doctor, the recovery of the appellee had reached its maximum at the time of trial, and whatever disability he had would be permanent. This condition would leave the appellee with pain on raising his arm above his head, and in some positions, he would have pain in the shoulder joint. The doctor advised the appellee to quit the type of lifting work he had to do at the time, due to the pain that he was having, for he had observed that when the appellee would try to work, and the doctor would see him later, the appellee would be unable to rest at night due to the pain in the shoulder after working, and he advised him to just stop work, it being the final opinion of the doctor that the appellee was not qualified to do the kind of work he was doing, and he would not advise him to do it, since if he uses his right arm and right hand, he will have to pay for it later with pain, due to the condition of his joint, and as a physician, he had advised him to avoid that pain if he could. * * *"

money, its decision must depend upon the evidence in the case in which the charge is given, and if there be *anything* in the evidence upon which the allowance of any *sum*, however small, can properly be made for such damage, the objection to the charge is met. * * * The law only exacts the kind of proof of which the fact to be proved is susceptible, but it does exact that. * * *

"It appears that before she was hurt she could and did walk to and from her work, and that since her injuries she has been compelled to ride upon street cars. From their own general knowledge and experience the jury could say that this diminished to some extent the returns from her employment, and we think this evidence was as definite as should be required to show loss of earning power to the extent indicated by it. Evidence is adduced to put the jury in possession of facts from which *they* can determine the extent of impairment of earning power, and it is not intended in itself to establish a fixed measure of damages. When the jury are informed of such a fact as that just stated, they have enough to enable them to allow something upon that score." (Emphasis added)

In H. J. Heinz Co. v. Ashley, Tex.Civ. App., 291 S.W.2d 427, 431, no writ, it is stated:

" * * * However, it is settled law that where plaintiff is seeking to recover for impairment of his earning capacity, 'a very exact computation or assessment of the sum to be allowed in any particular case is doubtless impossible, and hence the determination of the amount is deemed to be peculiarly within the discretion of the trier of facts. However, a verdict must be, not a mere conjecture, but an intelligent judgment, based upon proof of circumstances from which a conclu-

sion is to be drawn.' 13 Tex.Jur. 193–194, paragraph 93.

"In McIver v. Gloria, 140 Tex. 566, 169 S.W.2d 710, 712, it was held that in a suit to recover for decreased earning capacity in the future, 'the amount which the plaintiff might have earned in the future is always uncertain, and must be left largely to the sound judgment and discretion of the jury. However, the verdict must be based on something more than mere conjecture. It must be an intelligent judgment, based upon such facts as are available.'

"In the same case the court held that where plaintiff is employed at a fixed wage or salary, the amount of his previous earnings ordinarily must be shown, and, 'If plaintiff's earning capacity is not totally destroyed, but only impaired, the extent of his loss can best be shown by comparing his actual earnings before and after his injury.' * * *"

We hold that there was evidence of probative force to support the jury's finding to special issue No. 4, and that the evidence was amply sufficient to sustain such finding.

After reviewing the entire record in this cause in the light of the rules enunciated in the case of In Re: King's Estate, 150 Tex. 662, 244 S.W.2d 660, we hold that the finding of the jury in response to issue No. 4 is not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

We further hold that the jury's award of $17,500.00 for personal injuries (Issue No. 4) to plaintiff was not excessive under the record in this cause; $7,000.00 of same can clearly be supported for pain and suffering, past and future, and the remainder of $10,500.00 can be supported by the other elements of damages outlined in the definition given by the trial court

**154**

in connection with special issue No. 4, in view of the impaired earning capacity of plaintiff and considering his past earnings and considering his life expectancy of 14.14 years, as well as considering the entire record in the case.

 We also hold that the trial court in submitting special issue No. 4 did not err in assuming the existence of an injury to the appellee because the fact of injury was established without dispute in the evidence. In this connection see Texas & P. R. Co. v. Dickey, Tex.Civ.App., 70 S.W. 2d 614, writ refused, wherein it was stated:

> "The court did assume in submitting the issues that plaintiff had received 'injuries.' However, since it was admitted that plaintiff had received several injuries to his body, the court had a right to so assume in submitting the case to the jury. Lloyds Casualty Company of New York v. Grilliett (Tex.Civ.App.) 64 S.W.2d 1005, par. 2, and cases there cited; Security Union Insurance Co. v. Hall (Tex.Civ.App.) 37 S.W.2d 811."

 We further hold that the trial court correctly submitted special issue No. 6, asking the reasonable cost of repairing the appellee's truck since there was both pleading and proof to support it. After due and proper qualification plaintiff testified to the effect that the reasonable cost of repair of his truck would be $1,000.00. To meet this proof plaintiff filed a proper trial amendment and the trial court submitted special issue No. 6 in conformity with the pleading and proof. (The jury found the reasonable cost of repairs to be $700.00 in response to issue No. 6). In this connection see 17 Tex.Jur.2d, Damages, Sec. 92, pp. 163–164, wherein it is stated:

> "Generally, the measure of damages for injury to a vehicle is established by proof of the market value of the vehicle immediately before the injury and the market value immediately aft-

er, at the place of injury, *or by the cost of putting the vehicle in a condition as good as it was before the injurious occurrence.*"  (Emp. added)

Appellant's remaining points and contentions are overruled.

Finding no reversible error in the record, the judgment of the trial court is affirmed.

Affirmed.