**GERLAND'S FOOD FAIR, INC.,**
**Appellant,**

v.

**Jo Anne HARE et vir, Appellees.**

**No. 17742.**

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Oct. 23, 1980.

Supplemental Opinion Dec. 18, 1980.

Rehearing Denied Jan. 8, 1981.

Crady & Peden, Clare S. Hirling, Houston, for appellant.

Richard B. Stilwell, Houston, for appellees.

Before PEDEN, EVANS and WARREN, JJ.

PEDEN, Justice.

Gerland's Food Fair, Inc. appeals by writ of error from a default judgment in a slip and fall suit brought by Jo Anne Hare and her husband, Desmond Hare. The appellant complains that the trial court erred in entering the default judgment because the appellees' petition failed to state a cause of action against it, because no proper service of process was obtained, and because the evidence is insufficient to support the damage awards of $500,000 to Mrs. Hare and $100,000 to Mr. Hare. We order a remittitur of $250,000 as to damages awarded to Mrs. Hare and $60,000 as to Mr. Hare.

In its first point of error the appellant complains that the plaintiffs' petition fails to state a cause of action. Specifically, appellant says the petition alleges no facts giving rise to a duty for the defendant to act because it contains no allegation that the defendant owned, occupied, or controlled the premises in question. Further, appellant argues that the plaintiffs' allegations amount only to assertions that the events in question occurred in a grocery store whose name was similar to the defendant's corporate name.

The caption of the plaintiffs' petition is: "*Jo Anne Hare et vir vs. Gerland's Food Fair, Inc.*" In the opening sentence the plaintiffs complain of "Gerland's Food Fair, hereinafter referred to as Defendant", but in paragraph I they say: "The Defendant, Gerland's Food Fair, Inc. . . ."

In the next paragraph they allege that Mrs. Hare "was shopping for groceries in Gerland's Food Fair at 10505 Telephone Road. . . . Plaintiff was proceeding down one of the aisles in the Defendant Grocery Store . . ." when she slipped in an oily substance and fell to the floor. The petition then contains three specific allegations of negligence on the part of "the Defendant store" in causing or permitting the oil to be on the floor.

In the 1979 case of *Stoner v. Thompson*, 578 S.W.2d 679, the Texas Supreme Court reviewed Texas law as to the requirement that a plaintiff's petition state a cause of action if a default judgment based upon it is to withstand a direct appeal:

In determining whether a cause of action was pled, plaintiff's pleadings must be adequate for the court to be able, from an examination of the plaintiff's pleadings alone, to ascertain with reasonable certainty and without resorting to information aliunde the elements of plaintiff's cause of action and the relief sought with sufficient information upon which to base a judgment. *C & H Transportation Company v. Wright*, 396 S.W.2d 443 (Tex.Civ. App.1965, writ ref'd n. r. e.). Mere formalities, minor defects and technical insufficiencies will not invalidate a default judgment where the petition states a cause of action and gives "fair notice" to the opposing party of the relief sought. *Edwards Feed Mill v. Johnson*, 158 Tex. 313, 311 S.W.2d 232 (1958).

. . . . .

. . . The controlling principle has been correctly summarized:

"The rules expressly countenance more general allegations than formerly were permitted, and the default judgment will stand if the plaintiff has alleged a claim upon which the substantive law will give relief, and has done so with sufficient particularity to give fair notice to the defendant of the basis of his complaint, even though he has stated some element or elements in the form of legal conclusions which will need to be revised if attacked by special exceptions." 4 McDonald, Texas Civil Practice § 17.23.3 at 120 (1971).

We hold that the plaintiffs' petition gives fair notice to the defendant that the events in question allegedly occurred at the corporation's grocery store on Telephone Road.

In its second and third points of error, the appellant complains of the sufficiency of service of process. The plaintiff's petition recites that the defendant can be served through its duly registered agent, Mr. A. J. Gerland, Jr. The constable's return indicates that it was executed on March 1, 1979, "by summoning the __Gerland's Food Fair, Inc.__ a corporation by delivering to __E. L. Peterson__, in person __vice-president__ of the said __corporation__ a true copy of this writ, together with accompanying certified copy plaintiff's original petition." There is no other reference in the record to E. L. Peterson or to any vice-president of the defendant corporation.

Appellant contends that service is defective because: 1) the person to whom the citation was delivered is not the person to whom it was addressed, and 2) the face of the record does not affirmatively show that E. L. Peterson is in fact the vice-president of the corporation.

The presumptions which are ordinarily made in support of due service do not apply when a direct attack is made upon a default judgment, and the record in such a case must affirmatively show strict compliance with the provided mode of service. *Whitney v. L & L Realty Corporation*, 500 S.W.2d 94 (Tex.1973); *McKanna v. Edgar*, 388 S.W.2d 927 (Tex.1965); *Flynt v. City of Kingsville*, 125 Tex. 510, 82 S.W.2d 934 (1935). However, Article 2.11 of the Texas Business Corporation Act provides that a domestic corporation may be served by delivering process to its president, vice-presi-

dents, or registered agent. Since the citation in this case was delivered to a vice-president of the corporation, the required compliance has been demonstrated. The statement in the constable's return that E. L. Peterson is a vice-president of the corporation is prima facie evidence that he is indeed such officer and suffices to show valid service. *NRTRX Corporation v. Story*, 582 S.W.2d 225 (Tex.Civ.App.1979, writ ref. n. r. e.); *Pipe Line Park Properties, Inc. v. Fraser*, 398 S.W.2d 154 (Tex.Civ.App. 1965, no writ). See also 2 McDonald, Texas Civil Practice §§ 9.16–9.17.

In its other four points of error the appellant complains that there is no evidence or insufficient evidence in the record to support the trial court's award of damages to the plaintiffs. Appellant contends that: 1) there was no evidence that medical expenses already incurred were either necessary or reasonable, 2) there was no evidence at all regarding the amount of future medical expenses, 3) the expert testimony did not establish a causal connection between all of Mrs. Hare's claimed injuries and her fall in the grocery store, and 4) the plaintiffs' own medical expert testified that many of the claimed injuries would not be permanent.

The petition states in general terms that Mrs. Hare sustained permanent and serious injuries causing her to require medical attention in the past and in the future. It alleges that as a direct result of her fall she was caused to suffer physical pain and mental anguish, has incurred necessary and reasonable medical expenses, will sustain extensive medical expenses in the future, and has sustained a loss of earning capacity. She alleges that she has been damaged in the sum of $500,000.

The only allegation regarding Mr. Hare's cause of action is that as a result of his wife's fall he has been damaged by the loss of his wife's services in and around the house. He alleges that his damages amount to $100,000.

■ At the hearing on damages, Mr. and Mrs. Hare testified briefly. The only other evidence offered was a deposition of Dr. Robert J. Goodall, a neurological surgeon, taken by the Hares' attorney. The appellant does not complain of the admissibility of Dr. Goodall's deposition testimony as a whole, only of those parts of it which relate to information given him by others. Appended to the deposition are various documents which purport to be a curriculum vitae of Dr. Goodall, letters from various physicians who examined Mrs. Hare, and assorted medical records and reports. Most of these documents are hearsay with respect to the hearing on damages, and only Dr. Goodall's own reports are sufficiently authenticated or otherwise shown to be admissible under any exception to the rule against hearsay. Except for his reports, they are without probative force and will not support the judgment. *Aetna Insurance Company v. Klein*, 160 Tex. 61, 325 S.W.2d 376 (1959).

If the trial court's award is to stand, competent evidence to support it must be found in the testimony of the Hares and the deposition and reports of Dr. Goodall. Since the cause of action is unliquidated, the court must hear evidence as to damages and render judgment therefor. Rule 243, Texas Rules of Civil Procedure.

■ *Lost earning capacity.* There is no evidence to support an award under this element of the damages. There is no testimony that Mrs. Hare has ever been employed or even that she has worked in and around the home, and no value is given for any services she may have rendered in the past or might have been expected to render in the future. Even if we infer from the fact of injury that she is less capable of earning money than she was before the injury, there is still no way for us to determine the degree of any such impairment. See *Bonney v. San Antonio Transit Company*, 160 Tex. 11, 325 S.W.2d 117 (1959); *Martin v. Weaver*, 161 S.W.2d 812 (Tex.Civ. App.1941, writ ref. w. o. m.); *Stoner v. Hudgins*, 568 S.W.2d 898 (Tex.Civ.App.1978, writ ref. n. r. e.). See also, generally, Annot., "Sufficiency of Evidence in Personal Injury Action to Prove Impairment of Earning Capacity and to Warrant Instruc-

tions to Jury Thereon," 18 A.L.R.3d 88 (1968).

■ *Medical Expenses.* The evidence regarding Mrs. Hare's medical expenses was insufficient to support an award of damages. She testified that she was taking medication for seizures, which she said she had not experienced before the fall, that she was hospitalized on the day of the fall, and that she remained in the hospital for three weeks. There is no evidence as to the cost of the medication or the amount of the hospital's charges.

At the hearing Mrs. Hare's attorney asked her if she knew that her medical expenses incurred to this time had totaled $12,677. She replied, "That's my understanding, yes." Assuming that the expenses referred to were limited to those incurred as a result of the fall in question, and assuming that Mrs. Hare's understanding as to the amount spent is based on personal knowledge, there is still no evidence that the charges were necessary and reasonable. Without such a showing the expenses are not recoverable. *Dallas Railway & Terminal Company v. Gossett*, 156 Tex. 252, 294 S.W.2d 377 (1956); *Delta Air Lines, Inc. v. Gibson*, 550 S.W.2d 310 (Tex. Civ.App.1977, writ ref. n. r. e.); *American Central Insurance Company v. Melton*, 389 S.W.2d 177 (Tex.Civ.App.1965, writ ref. n. r. e.).

She testified that she believed she would "continue to sustain medical expenses in this amount for the future." She gave no reason for her belief and no estimated figure for the probable expense. Dr. Goodall testified that she should continue taking the anti-seizure medication for at least two or three years or as long as her seizures persist. He felt that her seizures "would clear up because the EEG's have been normal" but that he could not anticipate how long her future treatment would take and that he would expect that some ten percent of patients with head injuries such as those claimed by Mrs. Hare would not have the seizure activity "diminished to a small degree." Again, there was no estimate of the probable cost of future treatment.

We find no other competent evidence regarding medical expenses, past or future.

*Physical pain and injury.* Mrs. Hare testified that as a result of the fall she became nauseated and ill. At one point she said that she went into a coma. She stated that she was in good physical health before she fell in the grocery store and had never had this type of seizure. She also testified that since her fall her vision and her ability to walk have been impaired, that she now limps, and that her condition is not improving.

Dr. Goodall testified by deposition that he first saw Mrs. Hare about ten days after the incident, that she complained of headaches, that "she had sustained a head injury and apparently had developed some type of seizure," and that she later had other seizures, which were brought under control with medication. She described to him her nausea and told him about a "peculiar smell or aura like rotten cabbage" and about an occasion when she "heard some men talking in her head."

Dr. Goodall said that upon examining Mrs. Hare, he found that "[h]er general physical examination was essentially within normal limits, except for tenderness over the occipital nerves. . . . [W]e also carried out laboratory studies in the hospital, including an electroencephalogram, which was normal, and cerebral arteriograph, which was normal." He examined her again in June and July of 1978, and in January and October of 1979, cautioning her each time to continue her anti-seizure medication.

Some of the evidence offered was not competent and may not be considered. Mrs. Hare testified, for example, that it was her understanding that she sustained permanent brain damage as a result of the fall. This is hearsay or is a medical opinion which Mrs. Hare was not shown to be qualified to offer. She also testified that "[a]ccording to the doctor, I am classified as legally blind. I think it is 20 over 400." Although she may testify that her vision has been impaired, this statement as to the

extent of the impairment is hearsay and a medical opinion. Dr. Goodall related that a report by ophthalmologist Dr. Charles Dobbs stated: "Her best corrected visual acuity was, right eye, Count Fingers; left eye, 20/400. There is no operation or glasses that will correct that condition. He doesn't say what that condition was, and I do not know, either, what he's referring to." These reports are hearsay.

Documents appended to Dr. Goodall's deposition contain evidence that both supports and refutes her claim of injuries. His observations were reported, along with her complaints. Her "opthalmological examination" was found to be within normal limits. A C.T. (?) study showed "no brain parenchymal abnormalities" and "no extracerebral collections." A bilateral internal carotid and left vertebral angiography produced normal findings. Electroencephalograms taken on May 17, 1978, and June 22, 1978, and January 29, 1979, all resulted in normal findings. "Cerebellar tests which could be carried out were within normal limits." "X-rays of the cervical spine revealed degenerative changes of a chronic nature and of questionable relationship to the patient's current complaints." Dr. Goodall reported: "Suspect that this patient sustained cerebral contusions to the occipital lobes in the cerebellum and subsequently had a cerebellar type of seizure." "Review of neurological systems was essentially normal."

The material that follows is contained in reports made by Dr. Goodall on the physical examination and treatment of Mrs. Hare. In 1978 she was a well developed, well nourished, 46 year old woman. Her chief complaint on May 15, 1978, was headaches. The doctor's impression was:

Suspect that this patient sustained cerebral contusion to the occipital lobes in the cerebellum and subsequently had a cerebellar type of seizure preceeded by both the olfactory and auditory aura that she describes above. She also apparently contused the occipital nerves and has some occipital neuralgia and anxiety reaction.

A report dated May 20, 1978 included this material in the nature of a history:

DETAILS OF COMPLAINT: This patient was transferred from Methodist Hospital and I saw her on May 15th. She stated that she had sustained a head injury and then developed some type of seizures. She was taken by ambulance to Methodist Hospital.... The patient recalls 4 or 5 years ago bumping her head on an overhead rack in a store and was dazed momentarily and believes that she struck the right parieto-occipital area following that injury. She had frequent headaches, starting in the occipital area and encompassing the upper neck and entire head. She resorted to simple anodynes, but they frequently failed and as time passed, she felt they were becoming more severe and they even tried her on Dilantin.... In the interim period, except for occasional headaches, she was quite well until 10 days ago, when the patient slipped and fell in a grocery store on some vegetable soil. She fell backwards on the floor, striking the back of her head. She felt as though something had snapped in her head, she stated, and she had some headache, neck pain and pain in her right shoulder. A friend came after her and took her to Southwest Memorial Hospital, where she was x-rayed and released to go home, although they advised her to stay. She had severe headache that night and was sick at her stomach. Dr. Johnson was called and he advised admission to the hospital and she was admitted to Memorial Southeast that night. The next a. m. she was very nauseated and continued to have headaches with no relief with medication. That night, she apparently had some type of seizure, could not be aroused. Dr. Johnson witnessed the seizure and an additional seizure, as she was taken by ambulance to Methodist Hospital and Dr. Johnson described to me what appeared to be a cerebellar brainstem type of seizure activity. The patient states her only recollection was of olfactory aura of something like cooking of onions with no vent on. She also had an auditory aura like a

little man in her ears talking and she couldn't understand him. Her next recollection of events was waking up in Methodist Hospital about midnight to 1:00 a. m. with an occipital headache and some blurring of her vision.

She was treated with medications, apparently quite heavily, as she appeared to be quite lethargic and it was difficult for her to speak when I saw her, but further review of neurological systems was essentially normal.

Dr. Goodall's report of June, 1978 included:

CHIEF COMPLAINT: Convulsions

HISTORY OF PRESENT ILLNESS: This patient was brought into the Emergency Room because of seizure. She had been discharged from this hospital approximately three to four weeks ago after workup because of a fall in which she apparently sustained a head injury. It was thought at that time she might have possibly been having cerebellar type seizures with a auditory and olfactory aura. The previous history is well documented. She states that since she went home she was doing well except for frequent headaches in the right occipital area and yesterday apparently had a seizure and was brought in. At the time I saw the patient she was responding. Her speech seems a little slurred, but she had some IV Valium and Dilantin. She complained of some residual headache in the right occipital area and we felt that she had some slight weakness in the right arm and leg.

The appellant contends that the physical injuries cannot support the judgment because they were not shown to be caused by the fall. Mrs. Hare testified that she became nauseated and ill as a result of the fall. She said that before the fall she was in good physical health but that since then she had had seizures and her vision and motor ability have been affected.

■ In general, a witness need not be an expert in medical matters to state an opinion as to his own physical health. See 2 Ray, Texas Law of Evidence § 1427 (3rd ed.

1980); *Republic Bankers Life Insurance Company v. Morrison*, 487 S.W.2d 373 (Tex. Civ.App.1972, no writ); *Security Mutual Casualty Company v. Turner*, 457 S.W.2d 305 (Tex.Civ.App.1970, no writ); *Life & Casualty Insurance Company of Tennessee v. Rivera*, 420 S.W.2d 788 (Tex.Civ.App. 1967, no writ). Mrs. Hare is, of course, competent to testify as to how she felt, but she contends that her seizures, headaches, poor vision, and motor impairment are caused by brain damage she suffered when she hit her head when she fell. The presence or absence of brain damage, together with its cause and its effect on the rest of the body, are subjects within the field of medical expertise, so we rely on the expert medical testimony of Dr. Goodall to establish their cause. See *Greene v. Anders*, 473 S.W.2d 622 (Tex.Civ.App.1971, writ ref. n. r. e.); *Tyler Mirror & Glass Company v. Simpkins*, 407 S.W.2d 807 (Tex.Civ.App.1966, writ ref. n. r. e.); *Reliable Life Insurance Company v. Steptoe*, 471 S.W.2d 430 (Tex. Civ.App.1971, no writ); *Travelers Ins. Co. v. Blazier*, 228 S.W.2d 217 (Tex.Civ.App.1950, writ dism.). 1 McCormick & Ray § 531 (1956 ed.).

Dr. Goodall testified that he had been unable to verify that Mrs. Hare suffered visual abnormalities or increased motor disability as a result of her fall, but he agreed that her visual conditions can be caused by a blow to the head such as Mrs. Hare received. With regard to the cause of the seizures, the following colloquy was had:

Q: Do seizures frequently result from a blow to the back of the head, or is it a possible result?

A: Yes. She had no seizure history prior to that time, and I don't think there was any doubt that this patient got a blow to get some cortical participation and, in that concern, caused the seizures.

Q: And based upon reasonable medical probability of the seizures and that she had them after the fall, were they caused by the fall and the blow to the head?

A: Yes, sir. I think they were.

This testimony clearly suffices to establish the causal connection between the fall in the store and Mrs. Hare's seizures.

█ As to the permanence of Mrs. Hare's injuries, we have noted that her statement that it was her understanding that she had permanent brain damage is both hearsay and an opinion which she is not qualified to give. Dr. Goodall testified that Mrs. Hare's "general physical examination was essentially within normal limits," that her electroencephalograms and arteriographs were normal, and that he would think that "over a period of time, with proper control, she would clear up because the EEG's have been normal, not indicating any bad scarring or spike focus in the brain." On the other hand, the doctor also stated that probably ten percent of patients with head injuries like Mrs. Hare's "do not have this seizure activity diminished to a small degree."

█ There is competent, qualified evidence to show that Mrs. Hare suffered seizures as a result of head injuries sustained in her fall and that there is a ten percent chance the seizures will continue undiminished.

█ *Mental anguish.* Mrs. Hare testified that she is subject to chronic depression, and Dr. Goodall stated that she had been very depressed and "upset about having seizure activity." He said it is logical to believe that her depression was caused by her head injury. This evidence supports the conclusion that Mrs. Hare suffered mental anguish and depression. In any event, mental suffering may be implied from injuries accompanied by physical pain, even without direct proof of either existence or cause. *Applebaum v. Michaels,* 384 S.W.2d 148 (Tex.Civ.App.1964, writ ref. n. r. e.); *Griffith v. Casteel,* 313 S.W.2d 149 (Tex.Civ.App.1958, writ ref. n. r. e.).

The trial judge made no findings of fact or conclusions of law, and it is impossible to determine from the judgment how much of the $600,000 awarded was allowed for each element or even whether each element alleged was found to have been proven.

In non-jury hearings, the trial judge is presumed to have disregarded all incompetent evidence. We conclude that the competent evidence adduced in our case does not justify an award of $500,000 to Mrs. Hare.

The appellant's points of error as to damages are no evidence and insufficient evidence points. Even in the absence of a point of error complaining of excessiveness as such, the proper course for this court under these circumstances is remittitur under Rule 440, Texas Rules of Civil Procedure. *Texas Pipe Line Co. v. Hunt,* 149 Tex. 33, 228 S.W.2d 151, 155 (1950); *Rector v. De Arana,* 398 S.W.2d 911 (Tex.1966); *Houston Belt & Terminal Ry. Co. v. Lynch,* 221 S.W. 959 (Tex.Com.App.1920, Judg. adopted).

█ Having considered the evidence in this case and the decisions in other comparable cases as to amounts that have been found to be excessive, we conclude that the amount which Mrs. Hare is entitled to recover is $250,000.

*Loss of wife's services.* The entire testimony regarding Mr. Hare's loss of his wife's services is as follows:

MR. STILWELL: Mr. Hare, would you tell us whether or not your wife's behavior has changed since the time of this injury.

MR. HARE: Definitely. She's a completely different person than she was a year and a half ago before she sustained the fall.

MR. STILWELL: How has it affected ya'll's relationship?

MR. HARE: Before that she was outgoing and we had very excellent, very good sexual relations. And now it's just —well, her whole demeanor and everything has changed in regards to that and which I realize—the doctor has counseled me on her problem, and it is due to this injury to the brain, and it is deteriorating, and he is counseling me to help deal with what she will live with the rest of her life. She's not able to drive or chauffeur her grandchildren anymore. I am trying to get a permanent live-in to help

her about the house. I am trying to help her all I can between my trips.

Excluding what is obviously hearsay, the gist of Mr. Hare's testimony is that his wife's behavior, demeanor and their relations have changed, that she is no longer able to drive, and that he is trying to get someone to help her around the house. There is no additional evidence as to permanency of Mrs. Hare's condition.

■ Ordinarily, in a suit by a husband for injuries to his wife, specific proof of the pecuniary value of her services is not required. *Texas Telegraph & Telephone Co. v. Scott*, 60 Tex.Civ.App. 39, 127 S.W. 587 (1910, writ ref.); *Beaumont City Lines, Inc. v. Williams*, 221 S.W.2d 560 (Tex.Civ. App.1948, writ ref. n. r. e.). However, there must be some probative evidence on which to base a judgment. In our case there not only is no evidence of the value of Mrs. Hare's services but also no evidence to show what services, if any, she cannot now perform, except that she now needs help around the house and that she is no longer able to drive. The evidence is insufficient to support the trial court's award of $100,-000 on Mr. Hare's cause of action; we consider that it is excessive by $60,000.

If within fifteen days from the date of this opinion, Mrs. Hare files in this court a remittitur of $250,000, the judgment of the trial court will be reformed and, as to her, affirmed for the sum of $250,000. If within the same period, Mr. Hare files a remittitur of $60,000, the trial court judgment as to him will be affirmed for the sum of $40,000. If only one of them files a remittitur, the cause as to the other will be severed and remanded for a hearing on the damages issue, and if neither of them files a remittitur, the entire cause will be remanded as to damages.

### SUPPLEMENTAL OPINION

In compliance with the suggestions of remittitur by this court in our opinion of October 23, 1980, appellee Jo Anne Hare has filed a remittitur of $250,000, and Desmond Hare has filed a remittitur of $60,000. The judgment of the trial court is reduced by the amounts of such remittiturs; as so modified, that judgment is affirmed.

EVANS and WARREN, JJ., participated.