Sung Man MIN and Ann Min, Appellants,

v.

John Manuel AVILA, Appellee.

No. 01–98–00727–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 6, 1999.

Langdon Milton Smith, Houston, for Appellants.

Andrew P. McCormick, Houston, for Appellee.

Panel consists of Chief Justice SCHNEIDER and Justices O'CONNOR and TAFT.

## OPINION

TIM TAFT, Justice.

Appellants, Sung Man Min and Ann Min, appeal a summary judgment granted on limitations after the trial court set aside a default judgment by granting a bill of review. We affirm.

## Background

### A. The Underlying Case

The Mins sued Avila in May 1994 in Cause No. 633,114, *Sung Man Min and Ann Min, Individually and as Next Friends of Mee Min, a Minor.* They sought personal-injury damages arising out of a January 1992 automobile collision and moved for default judgment when Avila did not answer. Their motion addressed service on Avila by tracking the recitals in the return of service filed by Harris County Deputy Constable M.G. Hightower, who stated he had served John Manuel Avila at 7:32 a.m. on May 20, 1994, at 444 Harvard # 18, Houston. The Mins' attorney listed 444 Harvard # 18 as Avila's last known address and stated he was not then in the military service, in accordance with 50 U.S.C.App. § 520(1) (1994). The trial court rendered a $108,000 default judgment against Avila on July 28, 1994. The judgment recites Avila was "duly and legally cited to appear," yet "failed to appear and answer and wholly made default."

### B. Bill of Review—Default Set Aside

Almost one year later, Avila filed his verified bill of review in this cause to set the $108,000 default judgment aside. Avila denied ever being served with process in Cause No. 633,114, and stated he had no notice of the judgment until May 1995, when a private investigator contacted him and said he had been retained to collect on the judgment. The investigator located Avila at 116 Kendall, Houston, Texas 77003, a different address than alleged in seeking the default judgment. The Kendall address was Avila's home, which he purchased with his wife on September 8, 1992. Avila and his wife each executed affidavits in support of the petition for bill of review and supported those affidavits with copies of the purchasing and real estate lien documents. Avila's petition also described and provided a copy of a June 13, 1995 letter from a deputy constable authorizing levy on Avila's non-exempt property, which prompted him to take immediate action to set the judgment aside by engaging counsel.[1]

The record on appeal contains a full reporter's record of the bench trial of the bill of review, at which Avila and Constable Hightower were the only witnesses. The trial court set the default judgment aside and signed findings of fact and conclusions of law to support the ruling. These reflect the following:

- Officer Hightower did not serve Avila with the citation in Cause No. 633,114 at 7:32 a.m. on May 20, 1994, at 444 Harvard # 18, Houston, Texas 77007, but instead served an unknown person at that address.

- Avila was not served on May 20, 1994 because he had moved, almost two years before, from the apartment unit at 444 Harvard # 18, Houston, Texas 77007, to a home he purchased at 116 Kendall, Houston, Texas 77003.

---

1. At the trial of the bill of review, Avila did not introduce into evidence either the documents showing purchase of the Kendall address or the June 13, 1995 letter from the constable. Nor did his wife testify.

- A family with the surname "Licona" lived at 444 Harvard # 18 on May 20, 1994.
- Avila had never returned to 444 Harvard # 18 after he moved to 116 Kendall.
- Avila was not properly served with process and had no notice of the default judgment signed on July 28, 1994 until May 1995, when he acted with due diligence to set the judgment aside.
- Avila's failure to answer was unintentional.
- The default judgment against Avila was void and unenforceable because he was never served.

## C. Bill of Review—Trial of Underlying Case

The default judgment having been vacated, the bill of review proceeded by reopening the underlying case, with Avila's having made a general appearance. *See McKanna v. Edgar*, 388 S.W.2d 927, 930 (Tex.1965). Avila promptly filed a motion for summary judgment, in which he claimed the two-year statute of limitations barred the Mins' personal-injury claims. TEX. CIV. PRAC. & REM.CODE ANN. § 16.003 (Vernon 1986). Avila offered two reasons why limitations had expired, which the Mins disputed in their response. The trial court granted Avila's motion, without specifying a particular reason, but reserved the claims of the Mins' minor child for trial on the merits. The bill of review judgment and the summary judgment became final for appeal when the trial court signed a judgment reflecting settlement of the claims of the Mins' minor child.

## Analysis

## A. Bill of Review—Requisites of Proof

In their first issue, the Mins contend the trial court erred by granting the bill of review because the evidence is legally and factually insufficient to establish that Avila was not served with process.

■ A bill of review is an independent, equitable proceeding by a party to a former action who seeks to set the judgment aside when it is no longer appealable or subject to a motion for new trial. *Caldwell v. Barnes*, 975 S.W.2d 535, 537 (Tex. 1998); *Medeles v. Nunez*, 923 S.W.2d 659, 662 (Tex.App.—Houston [1st Dist.] 1996, writ denied); *Commission of Contracts of the General Exec. Comm. of the Petroleum Workers Union v. Arriba, Ltd.*, 882 S.W.2d 576, 581 (Tex.App.—Houston [1st Dist.] 1994, no writ). Because it is an equitable remedy, the bill is available only when a party has demonstrated due diligence and shown, through no fault of its own, that no other legal remedy was available. *Caldwell*, 975 S.W.2d at 537–38.[2]

■ A bill of review constitutes a direct attack on a judgment by a party to that judgment. *McEwen v. Harrison*, 162 Tex. 125, 345 S.W.2d 706, 709 (Tex.1961) (orig.proceeding); *Medeles*, 923 S.W.2d at 662; *Burrows v. Miller*, 797 S.W.2d 358, 360 (Tex.App.—Tyler 1990, no writ). The presence of both parties before the court, here the Mins and Avila, is one factor that distinguishes Avila's attack on the default judgment as a direct attack and not a collateral attack. *See Hunt v. Ramsey*, 162 Tex. 133, 345 S.W.2d 260, 264 (Tex. 1961); 5 McDONALD, TEXAS CIVIL PRACTICE § 29:2 at 262 (1992 ed.).

■ Because Avila's bill of review is a direct attack, we indulge no presumptions in favor of valid issuance, service, or return of citation to support the default judgment. *Medeles*, 923 S.W.2d at 662; *Burrows*, 797 S.W.2d at 360; 5 McDONALD § 29:2 at 56 (Supp.1998) (citing *Medeles* ). The bill-of-review petitioner may therefore

---

2. Avila filed his petition for bill of review almost a year after the default judgment, and thus past the deadlines for a motion for new trial and restricted appeal. *See* TEX.R. CIV. P. 329b(a) (30–day deadline for motion for new trial); TEX.R.APP. P. 26.1(c) (six-month deadline for restricted appeal).

demonstrate that the judgment is invalid for lack of proper service of process, whether or not the face of the record discloses the invalidity and despite recitals of proper service in the judgment under attack. *McEwen,* 345 S.W.2d at 711; *Medeles,* 923 S.W.2d at 662; *Arriba,* 882 S.W.2d at 581; *Burrows,* 797 S.W.2d at 359–60. A default judgment is void and cannot stand unless the defendant has been served with process in strict compliance with the law, accepted or waived service, or entered an appearance. Tex.R. Civ. P. 124; *Medeles,* 923 S.W.2d at 663.

■ To succeed by bill of review, the petitioner must ordinarily allege and prove three elements: a meritorious defense to the cause of action supporting the earlier judgment; which the petitioner could not assert because of the fraud, accident, or wrongful act of the opposing party, or official mistake; untainted by any negligence on the petitioner's part. *Caldwell,* 975 S.W.2d at 537; *West Columbia Nat'l Bank v. Griffith,* 902 S.W.2d 201, 205 (Tex. App.—Houston [1st Dist.] 1995, writ denied). When a petitioner for bill of review claims the judgment is void for lack of proper service, and thus violates due process of law, the petitioner need not prove a meritorious defense, nor show fraud, accident, or mistake by the opposing party. *Peralta v. Heights Med. Ctr.,* 485 U.S. 80, 86, 108 S.Ct. 896, 900, 99 L.Ed.2d 75 (1988); *West Columbia Nat'l Bank,* 902 S.W.2d at 205; *Arriba,* 882 S.W.2d at 581.

To succeed on his petition for bill of review, therefore, Avila had to establish two elements: lack of proper service and his own diligence in setting the default judgment aside. The Mins confine their sufficiency challenge to the first element.

### 1. Standards of Review

■ When, as here, the appellate record contains a complete reporter's record of the trial, we review the trial court's findings of fact under the same standards for legal and factual sufficiency as govern review of jury findings. *Arriba,* 882 S.W.2d at 582; *In the Interest of M.J.Z.,* 874 S.W.2d 724, 728 (Tex.App.—Houston [1st Dist.] 1994, no writ). In reviewing challenges to the legal and factual sufficiency of the evidence, we review the legal-sufficiency challenge first. *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex. 1981).

In analyzing legal sufficiency, we consider only the evidence and inferences tending to support the challenged finding and disregard all inferences to the contrary. *Alm v. Aluminum Co. of America,* 717 S.W.2d 588, 593 (Tex.1986); *Arriba,* 882 S.W.2d at 582. If any evidence of probative force supports the finding, we must overrule the challenge and uphold the finding. *Southern States Transp., Inc. v. State,* 774 S.W.2d 639, 640 (Tex.1989); *Arriba,* 882 S.W.2d at 582. We may not conclude that evidence is legally insufficient unless it is unreasonable to infer a vital fact from the facts proved in the particular case. *Cannon v. ICO Tubular Servs., Inc.,* 905 S.W.2d 380, 386 (Tex. App.—Houston [1st Dist.] 1995, no writ).

In determining factual sufficiency, we must weigh all the evidence, both supporting and conflicting, and may set the finding aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (Tex.1951); *Arriba,* 882 S.W.2d at 582.

### 2. No Presumption of Service

■ The Mins rely on three substantive principles in challenging the legal sufficiency of the evidence to establish Avila was not served with process.[3] They first

---

**3.** The essence of the Mins' contentions is that legal principles preclude according any weight to the only evidence offered to prove absence of service. That rules of law or evidence preclude the court from giving weight to the only evidence to prove a vital fact is one of four ways to challenge legal sufficien-

claim the recitals in Officer Hightower's return are prima facie evidence that he served Avila. We agree. *Gerland's Food Fair, Inc. v. Hare,* 611 S.W.2d 113, 116 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). The Mins also claim, erroneously, that the recitals in the return are presumptively correct. As noted above, we indulge no presumptions in favor of valid service because this is a direct attack. *West Columbia Nat'l Bank,* 902 S.W.2d at 205–06; *Burrows,* 797 S.W.2d at 360; 5 McDONALD § 29:2 at 262.

### 3. Rebutting Recitals in Return of Service

The Mins' final premise is that the trial court could not consider Officer Hightower's testimony, that he could not remember serving Avila, nor any of Avila's own testimony. Because Avila and Hightower provided the only evidence at trial, the Mins claim there is no legally sufficient evidence to raise a fact issue to defeat the prima facie showing.

■ Although the recitals in the officer's return suffice as prima facie evidence of service, the jurisdictional power of the court derives from the *fact* of service and not the return itself. *Ward v. Nava,* 488 S.W.2d 736, 738 (Tex.1972); *Sanders v. Harder,* 148 Tex. 593, 227 S.W.2d 206, 209 (Tex.1950) *HCFCO, Inc. v. White,* 750 S.W.2d 23, 24 (Tex.App.—Waco 1988, no writ); *Martin v. Ventura,* 493 S.W.2d 336, 338 (Tex.Civ.App.—Tyler 1973, no writ). To defeat the prima facie showing, a defendant must do more than simply deny service: the defendant must corroborate denial of service with evidence of supporting facts and circumstances. *See Ward,* 488 S.W.2d at 738; *Sanders,* 227 S.W.2d at 209; *Cortimiglia v. Miller,* 326 S.W.2d 278, 285 (Tex.Civ.App.—Houston [1st Dist.] 1959, no writ). The corroborating

circumstances may consist entirely of circumstantial evidence, but must derive from a source other than the defendant who challenges service. *Ward,* 488 S.W.2d at 738; *Sanders,* 227 S.W.2d at 209; *HCFCO,* 750 S.W.2d at 24; *Cortimiglia,* 326 S.W.2d at 285.[4]

■ The prima facie case of the fact of service, as established by the recitals in the return, will remain undefeated when the record shows only that the challenger denies service and the serving officer cannot recall serving that particular defendant. *HCFCO,* 750 S.W.2d at 23; *Martin,* 493 S.W.2d at 338–39; *see Cortimiglia,* 326 S.W.2d at 286. When the party disputing service offers only this, and thus does not offer evidence of corroborating circumstances, the substantive consequence is that the recitals in the return become presumptively correct as a matter of law. *See HCFCO,* 750 S.W.2d at 23; *Martin,* 493 S.W.2d at 338–39; *see also White v. Payne,* 821 S.W.2d 727, 728 (Tex.App.—Houston [1st Dist.] 1991, writ denied) (applying presumption of service based on recitals in return when challengers offered only their own affidavit disputing notice).

The Mins maintain the presumption given effect in *HCFCO* and *Martin* controls here. They reason that the evidence impeaching the recitals in the return derived solely from Avila, who offered no evidence to corroborate his own testimony. These arguments misconstrue the corroborating-evidence requirement.

### 4. Corroboration of Lack of Service by Party Challenging Service

*Sanders v. Harder* extended the permissible range of corroborating evidence to include circumstantial evidence. 227 S.W.2d at 209. *Sanders* was a trespass-to-try-title action in which the only evidence

---

cy. *See Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997).

4. In requiring that denial of service be corroborated, the law recognizes the authority vested in the serving officer, who is subject to forfeiture of his bond and penalties if he does

not return a process or executes a false return. *See Hot Shot Messenger Serv. v. State,* 818 S.W.2d 905, 908 (Tex.App.—Austin 1991, no writ); TEX. LOC. GOV'T.CODE ANN. §§ 85.001(b), 85.021 (Vernon 1988).

offered to defeat the officer's return came from Mr. and Mrs. Sanders, the parties who challenged service. The Sanders stated the land at issue had been purchased in 1925 and claimed as their homestead when they married in 1933. They showed that until a writ of scire facias was served on them to establish title, they had possession of the land, without any interruption by Harder, during the seven-year period after rendition of the default judgment on which Harder relied. *Id.* The Sanders also established they had improved the land, again without interruption by Harder. *Id.* The duration of the possession by the Sanders and their improving the land were significant factors the supreme court relied on as incompatible with having received service of process announcing an adverse interest in the property. *Id.*

Although the corroborating evidence derived solely from the Sanders, the parties challenging service, the circumstantial evidence they provided was not only sufficient to defeat Harder's prima facie case, as established by the recitals, and thus place the issue of service before the jury, but also sufficient to support the jury's finding of no service. *Id.* at 207–09.

In *Ward v. Nava*, the defendant who challenged service also offered only his own affidavit as evidence. 488 S.W.2d at 737. In addition to stating he was not served, Ward described a telephone call from a person he did not know, who inquired about the lawsuit, thus prompting him to search his home for the suit papers, which he ultimately located. *Id.* From these circumstances, Ward concluded the papers had simply been left in his mailbox and brought into his home by his children. *See Ward v. Nava*, 483 S.W.2d 510, 511 (Tex.Civ.App.—Houston [14th Dist.], *rev'd*,

488 S.W.2d 736 (Tex.1972)). Here again, while acknowledging the prohibition against impeaching the officer's return solely on the basis of the defendant's testimony, the supreme court concluded the testimony was "some corroborating evidence" of lack of service.[5] 488 S.W.2d at 737–38; *see also Harrison v. Sharpe*, 210 S.W. 731, 733 (Tex.Civ.App.—Amarillo 1919, writ ref'd) (acknowledging that corroborating evidence must derive from "other sources" than the party challenging service, but also concluding that facts and circumstances presented by challenger strongly corroborated her claim that she was never served with process in tax-foreclosure action).

In *Cortimiglia v. Miller*, this Court concluded the party challenging service had not sufficiently corroborated her claim that she was never served, and vacated a bill of review granted in her favor. 326 S.W.2d at 285. Three persons testified in support of Miller's claim that she never received service: a deputy constable who testified Miller had told him she was never served; the deputy constable who claimed he served her but could not remember serving her; and a third deputy constable, who denied serving her. In addition, Miller testified she told the serving deputy constable he had not served her. We rejected reliance on any of this testimony. In contrast to the *Sanders, Ward,* and *Harrison* cases, in which the parties challenging service offered evidence of independent circumstances to corroborate their contentions they were never served, Miller's evidence never went beyond the legal conclusion of her own denial. 326 S.W.2d at 285. As such, the prima facie case, established by the recitals in the

5. Ward had argued that the court of appeals erred in holding he could not "seek the necessary corroboration from his own affidavit." 488 S.W.2d at 737. The supreme court declined to sustain that argument, despite agreeing that the affidavit constituted some corroborating evidence, but vacated the default judgment on other grounds. In marked contrast to the record before us, in which we

have a full reporter's record and findings of fact and conclusions of law supporting the trial court's rulings, Ward's affidavit was the only proof before the court. *Id.* Given the limited record, the supreme court declined to vacate the trial court's implied finding that Ward's affidavit did not preponderate against the recitals of the serving officer in the return. *Id.* at 737–38.

return, remained undefeated. *See White,* 821 S.W.2d at 728; *HCFCO,* 750 S.W.2d at 23; *Martin,* 493 S.W.2d at 338–39.

■ *Sanders, Ward,* and *Harrison,* and our applications of the corroborating-evidence requirement in *White v. Payne* and *Cortimiglia v. Miller,* compel the conclusion that the trial court was not categorically required to reject any and all evidence Avila offered, simply because he offered it. The prohibition against considering the challenger's evidence applies only if the evidence does not rise above mere denial of service, or mere denial of service buttressed only by the serving officer's inability to remember serving that particular party. The test of the evidence, from whatever source, is whether it demonstrates independent facts and circumstances that support, and thus corroborate, the challenger's claim.

Having established that Avila could dispute service based solely on his own evidence, we address whether the evidence he provided was legally and factually sufficient to defeat the prima facie case established by the recitals in Officer Hightower's return, and thus prevent the recitals from operating as a presumption of service.

### 5. Denial of Service Sufficiently Corroborated

■ Avila corroborated his claim that he never received service of process by testifying, at the trial of the bill of review, that he had moved, two years before service, from the apartment where Officer Hightower delivered the process, to a home at a different address. Avila also stated that he had discontinued electrical service when he moved from that apartment, that neither he nor anyone in his family had returned to the apartment since moving to the new address, and that a family of the surname "Licona" resided at the apartment address on the day Hightower attempted service. In addition, Avila described how he was contacted at his new home address when the Mins sought to levy execution on the judgment. The first contact was in May 1995, when the Mins' investigator, Jerry Noblitt, spoke with Avila at the new address, 116 Kendall. The second contact was a letter from a deputy constable sent to Avila at his new address on June 13, 1995, to notify Avila that a writ of execution had been issued to authorize seizure of assets to satisfy the judgment. None of this evidence was controverted.

Moreover, Avila elicited testimony from Officer Hightower that far exceeded mere inability to recall delivering the service papers to Avila. Hightower conceded he knew of instances in which the proper party was not served, that his work required him to deliver process to Hispanic and Vietnamese neighborhoods frequently, and that he spoke neither Spanish nor Vietnamese. Given these responses, Officer Hightower was asked what he did to ensure he was actually serving Avila. Office Hightower replied by describing his routine practices in delivering process, as follows: He announces the name of the person to be served to the person who answers the door; he assumes he has located the individual to be served if the person who answers the door accepts the papers; and he leaves without any further inquiry.

This evidence provided independent facts and circumstances and was legally sufficient to corroborate Avila's testimony and thus support the trial court's finding that Avila was never served with process and therefore had no notice of the Mins' lawsuit. We further hold, given this evidence, that the recital of proper service in the return does not so greatly preponderate against the trial court's finding of no service as to render that finding manifestly unjust.

We overrule the Mins' first issue presented.

### B. Summary Judgment

The Mins' second through seventh issues challenge the summary judgment

rendered in Avila's favor on the grounds limitations had expired. Issue seven is dispositive.

### 1. Standard of Review

The general standards for reviewing summary judgments are well-established, *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985), as are the standards that control review of summary judgments granted on the grounds limitations has expired. *See Burns v. Thomas,* 786 S.W.2d 266 (Tex.1990). In reviewing a summary judgment, we review all grounds the trial court ruled on and the movant preserves for review that are necessary for disposition of the appeal. *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625–26 (1996).

To warrant summary judgment based on limitations, the movant must conclusively establish that limitations bars the opponent's action. *Burns,* 786 S.W.2d at 267; *Zale Corp. v. Rosenbaum,* 520 S.W.2d 889, 891(Tex.1975) (per curiam). In addition, the movant must negate any tolling interposed by the nonmovant. *Id.; see Ardila v. Saavedra,* 808 S.W.2d 645, 647 (Tex.App.—Corpus Christi 1991, no writ).

It is undisputed that Avila complied with the first step. The Mins' automobile accident occurred on January 25, 1992, but they did not file their original petition until May 6, 1994, and thus long after limitations expired under the Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (Vernon 1986).

### 2. Tolling under Soldiers and Sailors Civil Relief Act

In their seventh issue, the Mins argue the trial court should have applied the tolling provision of the Soldiers and Sailors Civil Relief Act to render timely the petition they filed on May 6, 1994.

Avila's motion for summary judgment reflects he assumed the burden to negate

tolling by including arguments challenging the Mins' possible reliance on the tolling provisions of the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C.App. § 525 (1994) ("Relief Act"). Avila argued the Mins could not rely on the Relief Act to suspend the two-year statute of limitations under section 16.003 of the Civil Practices and Remedies Code. In the affidavit supporting his motion, Avila stated he was on active duty status for only two weeks a year, and that in 1994 those dates were approximately June 26, 1994 through July 9, 1994. Avila also claimed that because he was on active duty for only two weeks a year, his reserve duty did not materially affect or impair his ability to defend the Mins' lawsuit.

In response, the Mins claimed the Relief Act entitled them to toll limitations beyond the January 25, 1994 expiration date. They relied on excerpts from Avila's deposition, which they claim showed he was on duty as a military reservist for at least 116 days between the date of the accident and May 6, 1994, when they filed suit.[6] The Mins calculated the 116–day total from Avila's monthly weekend reserve duty, which they claim lasted three days, his two-week summer training duty in 1992, which they claim lasted 17 days, and the three five-day inspections he conducted in January, March, and October of 1993. The Mins claim sufficient tolling to render their May 6, 1994 filing timely and contend the trial court impermissibly resolved genuine issues of material fact on the tolling issue by granting summary judgment.

The record reflects that Avila served four years of active duty in the military, from 1975 to 1979, when he joined a United States Marine Corps Reserve Unit in Houston. Since 1987, Avila worked as a security officer with the University of Texas Police Department. Between January 25, 1992, when his automobile accident with the Mins occurred, and January 25,

---

**6.** In questioning Avila about his military service in deposition, the Mins took a completely different position than in their motion for default judgment, in which their attorney stated Avila was not in the military service.

1994, when limitations expired, Avila held the rank of staff sergeant in the United States Marine Corps Reserve. The excerpts from Avila's deposition provided by the Mins show the following reserve duties and no others: monthly "regular reserve" duty, served on a weekend; two weeks' annual reserve "training" duty in 1992; and three five-day inspections in 1993, when Avila served as a Mobilization, Readiness Deployment Task Inspector. Avila stated he did not serve an annual training in 1993 because he served the three inspection tours. He denied any other "special duties of any kind" and the excerpts from his deposition do not refer to any "active service" or "active duty." In his own affidavit, however, he describes his two-week annual training duty as "active duty status."

### a. Purpose of Tolling Provision of Relief Act

The tolling provision of the Relief Act appears in Section 525, which states in pertinent part:

§ 525 **Statutes of limitations as affected by period of service**

The *period of military service shall not be included* in computing any period now or hereafter to be limited by any law, regulation, or order for the bringing of an action or proceeding *in any court*, board, bureau, commission, department, or other agency of government *by or against* any *person in military service* or by or against his heirs, executors, administrators, or assigns, whether such cause of action or the right or privilege to institute such action shall have accrued *prior to or during the period of such service*

. . . .

(Emphasis added).

 The Relief Act suspends enforcement of civil liabilities for persons in the military service of the United States, so that they may devote themselves to the defense needs of the nation. 50 U.S.C.App. § 510 (1994); *see Crawford v.*

*Adams*, 213 S.W.2d 721, 723 (Tex.Civ. App.—Galveston, writ ref'd n.r.e.) (construing section 525 of the Relief Act). Because it applies to actions "by or against" persons in the military service, the Relief Act also protects persons like the Mins who may have claims against members of the armed forces. *Lester v. United States*, 487 F.Supp. 1033, 1038 (N.D.Tex.1980). The Relief Act is to be liberally construed to protect service persons who have abandoned their own affairs in favor of the nation's. *Boone v. Lightner*, 319 U.S. 561, 575, 63 S.Ct. 1223, 1231, 87 L.Ed. 1587 (1943); *Crawford*, 213 S.W.2d at 723; *Engstrom v. First Nat'l Bank*, 47 F.3d 1459, 1462 (5th Cir.1995); *see also Womack v. Berry*, 156 Tex. 44, 291 S.W.2d 677, 681–82 (Tex.1956) (construing section 521 of the Relief Act).

### b. "Active Service" or "Active Duty" Required for Tolling

 Section 525 of the Relief Act is a mandatory, unambiguous provision that automatically tolls limitations for those in military service and applies to actions filed in federal and state courts. *Crawford*, 213 S.W.2d at 723; *Bickford v. United States*, 656 F.2d 636, 639–40 (Ct.Cl.1981). Section 525 unequivocally excludes any *"period of military service "* in computing a statute of limitations for or against a *"person in the military service."* *Barstow v. State*, 742 S.W.2d 495, 499 (Tex.App.—Austin 1988, writ denied); *Scruggs v. Troncalli*, 307 S.W.2d 300, 304 (Tex.Civ.App.—Waco 1957, writ ref'd n.r.e.); *First Nat'l Bank v. English*, 240 S.W.2d 503, 506 (Tex.Civ. App.—Waco 1951, no writ); *Hamner v. BMY Combat Sys.*, 869 F.Supp. 888, 891 (D.Kan.1994), *aff'd*, 79 F.3d 1156 (10th Cir. 1996).

A *"person in military service "* under the Relief Act includes all members of the Army, Navy, Marine Corps, Air Force, and Coast Guard of the United States "and no others." 50 U.S.C.App. § 511(1). "Military service" as used in the Relief Act contemplates *"active duty "* with any of those branches. 50 U.S.C.App. § 511(1).

Section 511(1) includes other types of "active duty," not pertinent here, but does not refer at all to reservists. Section 511(2) of the Relief Act, which defines *"period of military service"* also contemplates *"active service"* only. 50 U.S.C.App. § 511(2) (1994); *see Bickford,* 656 F.2d at 639–41 (concluding that time plaintiff spent in law school under Excess Leave Program, and tour of duty that followed, constituted active military service that tolled six-year statute of limitations); *Diamond v. United States,* 170 Ct.Cl. 166, 344 F.2d 703, 706 (Ct.Cl.1965) (concluding that section 525 did not apply and that limitations began to run on serviceman's claim for retirement and active duty pay when he was released from active duty, which terminated his period of military service).

Although the Relief Act requires "active service," or "active duty" to trigger the tolling provisions, it does not define either term. The General Military Law provisions of Title 10 of the United States Code define *"active duty"* as "full-time duty in the active military service of the United States," including "full-time training duty," and "annual training duty." 10 U.S.C. § 101(d)(1) (1994). According to 10 U.S.C. § 101(d)(3) (1994), *"active service"* means "service on active duty or full-time National Guard duty." Section 101(c) defines "reserve" as "enlistment, appointment, grade, or office held as a Reserve of one of the armed forces," but only with respect to "an enlistment, appointment, grade, or office."

■ Section 525 of the Relief Act, when construed with section 511(1)–(2) of the Relief Act and 10 U.S.C. § 101(d)(1) and the cases that have interpreted section 525, requires a showing of active duty or active service to warrant suspending limitations. We hold that Avila was a "person in the military service," under 50 U.S.C.App. § 525, when he was on "active duty" while on "annual training duty." 10 U.S.C. § 101(d)(1) (1994). The summary judgment record reflects that Avila served only one annual training duty during the

two-year limitations period, however. This annual training duty occurred in summer 1992 and lasted two weeks, or 17 days by the Mins' calculations.

**c. Regular Reserve Duty is Not "Active Duty"**

Reserve components of the armed forces are governed by extensive provisions in Title 10, Subtitle E of the United States Code. As stated in section 10102 of Subtitle E, the purpose of reserve components is to

[P]rovide trained units and qualified persons *available for active duty* in the armed forces, in time of war or national emergency, and at such other times as the national security may require, to fill the needs of the armed forces whenever, during and after the period needed to procure and train additional units and qualified persons to achieve the planned mobilization, more units and persons are needed than are in the regular components.

10 U.S.C. § 10102 (1994) (emphasis added). Similarly, section 10103 describes the "basic policy for order into Federal service" as authorizing order of reserve components *"to active duty,"* to be retained for as long as needed. 10 U.S.C. § 10103 (1994) (emphasis added). Sections 10102 and 10103 show that duties as a reservist and "active duty" are distinctly different types of service in the armed forces. Chapter 1209 of Subtitle E further distinguishes reserve duty from active duty by listing the circumstances and instances in which the secretary of a division of the armed forces may order units of reserve components, and individual reserve members, to active duty. 10 U.S.C. § 12301(a)–(e) (1994). Some of these circumstances and instances exempt training from active duty and others do not, but no provision in section 12301 equates reserve duty with "active duty" or "active service."

■ For the tolling provisions of Section 525 to apply to a military reservist, therefore, there must be a showing that

the reservist's duty status changed to "active duty" and thus qualified as "military service" under section 511 of the Relief Act. *Bowles v. Dixie Cab Ass'n,* 113 F.Supp. 324, 325–26 (D.D.C.1953).

#### d. Limitations—Not Tolled

■ Based on our analysis of the governing code provisions, and the cases that have interpreted those provisions, we conclude that Avila's regular, weekend reserve duty does not qualify as "active duty," as defined by 50 U.S.C.App. § 511(2). Accordingly, the Mins may not include any of that duty in relying on the tolling provision of section 525. As addressed above, Avila's active-duty status while on annual training qualifies as a "period of military service" for section 525, but constitutes only two weeks of active duty, or 17 days by the Mins' calculations.

Without tolling, limitations expired on January 25, 1994, the two-year anniversary of the automobile collision. TEX. CIV. PRAC. & REM.CODE ANN. § 16.003 (Vernon 1986). Extending that deadline by 17 days results in a February 11, 1994 deadline for filing suit. As the Mins concede, they did not file this action until May 6, 1994.

We have not addressed, and cannot determine from the record, whether the three five-day inspections Avila conducted in January, March, and October of 1993 qualify as "active duty" and thus a "period of military service" under section 525. We need not decide this, however, because the maximum benefit the Mins could obtain from that period is 15 additional days over the 17 days of annual training duty, for a total of 32 days. To render the May 6, 1994 filing timely, the Mins needed 84 days, not 32.

We overrule the Mins' seventh issue presented.

Avila conclusively negated the Mins' attempted reliance on section 525 of the Relief Act to toll limitations beyond January 25, 1994. Accordingly, Avila was entitled to rely on his otherwise conclusively established affirmative defense that limita-

tions had expired when the Mins filed suit on May 6, 1994. Having established that the trial court properly rendered summary judgment in Avila's favor on that basis, we need not address the Mins' second through sixth issues, which challenge alternative theories Avila offered to support his limitations affirmative defense.

#### Conclusion

We affirm the judgment of the trial court.