Opinion issued September 10, 2009










 


 




In The

Court of Appeals

For The

First District of Texas






NO. 01-07-00792-CV






MORRIS ANDRESS, Appellant


V.


MEAH INVESTMENTS NO. 2, LTD., Appellee






On Appeal from the 239th District Court

Brazoria County, Texas

Trial Court Cause No. 17668JG






MEMORANDUM OPINION


 Appellant Morris Andress appeals from a trial court judgment holding him
personally liable for various corporate acts committed while he served as president
and director of DesignCare, Inc. In five issues, Andress argues that: (1) the trial court
erred in holding him personally liable to appellee, Meah Investments No. 2, Ltd.
("Meah Investments"), for the acts of DesignCare because there is no evidence that
he acted outside his corporate capacity; (2) the trial court erred as a matter of law in
holding that he was personally liable for breach of contract damages on a contract
between DesignCare and Meah Investments; (3) the evidence presented at trial was
insufficient to support the trial court's conclusion of law holding that he committed
fraud against Meah Investments; (4) the trial court erred as a matter of law in
awarding Meah Investments exemplary damages because there was no evidence or
insufficient evidence to prove Andress committed fraud against it; and (5) the trial
court erred as a matter of law in failing to specify the amount of damages assessed for
each of the defendants at trial. 

 We affirm in part, reverse in part, and remand the case for further proceedings.

Background

 DesignCare is a Texas corporation specializing in designing healthcare and
assisted living facilities. Nizam Meah, a gastroenterologist practicing in Lake
Jackson, Texas, was a partial owner and manager of Meah Investments. Meah
Investments, a Texas limited partnership, served as an investor behind Dr. Meah's
commercial real estate acquisitions.

 Dr. Meah sought an architectural firm to design a 10,000 square foot
ambulatory service center and medical office located at 109 Parking Way in Lake
Jackson, Texas ("Meah Project"). After receiving a recommendation from a
contractor, Dr. Meah contacted Andress to inquire about using DesignCare's services
to design the Meah Project. After several preliminary conversations, DesignCare
agreed to design the ambulatory service center.

 On September 18, 2000, Meah Investments and DesignCare executed a
contract, using a form contract written by the American Institute of Architects and
attaching an addendum clarifying certain clauses in the contract. In the contract,
Meah Investments was named as the owner of the Meah Project and DesignCare was
named as the architect of the Meah Project. The contract also named Michael Horan,
a licensed architect employed by DesignCare, as the "Architect's Designated
Representative" for the Meah Project. In the contract, Meah Investments agreed to
timely pay all monthly invoices and reimbursable expenses presented by DesignCare.

 The parties signed the contract as follows: Dr. Meah signed over a signature
block entitled "Owner." Below this signature block, the words "Meah Management
No. 2, Ltd. by Meah Investments, LLC, Manager" were handwritten and the words
"Nizam M. Meah, M.D." were typewritten. Andress signed over a signature block
entitled "Architect." Below this signature block, the words "Morris Andress,
President" were typewritten.

 On September 22, 2000, the parties signed a letter addendum to the contract
entitled "Revised-Fee Proposal for Ambulatory Service Center." Andress signed
above a signature block reading "Morris Andress, President." Dr. Meah signed below
a signature block reading "Agreed and Accepted, Meah Investments No. 2 by Meah
Investments, LLC."

 On October 6, 2000, DesignCare billed Meah Investments $11,205.00 for
asbestos abatement coordination, a field survey, a building background drawing, and
a preliminary floor plan. On November 10, 2000, DesignCare billed Meah
Investments $15,787.50 for construction documents and architectural and computer-aided drafting work. On December 1, 2000, DesignCare billed Meah Investments
$5,445.00 for construction documents and architectural and computer-aided drafting
work. On December 29, 2000, DesignCare billed Meah Investments $29,311.76 for
construction documents, third-party services, and various reimbursable expenses. 
Meah Investments timely paid all invoices as required under the contract terms. The
sum of the billed invoices through December 29, 2000 totaled $61,749.26. According
to DesignCare's records, DesignCare had completed work valued at $10,169.11 by
December 29, 2000 that had already been invoiced. 

 On January 19, 2001, Dr. Meah and Andress engaged in an e-mail exchange
concerning the slow progress of the Meah Project. In the exchange, Dr. Meah
repeatedly asked about various timelines for completing the architectural work. Dr.
Meah also wrote, "I was told that since this is not a multi-speciality surgical center,
things are simple and straight forward and things could go a little faster." Andress
replied that because DesignCare did not receive information from Meah Investments
in a timely fashion, DesignCare's completion of the architectural work was delayed. 
Andress stated that DesignCare was "working very hard to get this done and we are
very close to being completed. Try to understand these project[s] take time because
all of [sic] the individuals and firms that are involved."

 On May 24, 2001, DesignCare billed Meah Investments $22,865.92 for
construction documents and reimbursable expenses. Dr. Meah disputed the invoice
because of the construction delays on the Meah Project. DesignCare and Meah
Investments agreed that Meah Investments would pay one-half of the invoiced
amount. On June 12, 2001, Meah Investments paid $11,432.96 to DesignCare, as
required under the terms of the payment arrangement agreement. 

 Between August 1, 2001 and September 1, 2001, DesignCare billed Meah
Investments $12,305.05 for construction documents. Meah Investments did not pay
these expenses and hired counsel to give notice to DesignCare that Meah Investments
intended to terminate the contract due to DesignCare's "failure to substantially
perform in accordance with the terms" of the contract. On October 21, 2001, Meah
Investments filed suit against DesignCare, Andress, Melinda Andress, and Michael
Horan. In its amended petition, Meah Investments alleged breach of contract, fraud,
misrepresentation, negligence, professional malpractice, DTPA violations, and
denudation of the corporation.

 On November 13, 2001, DesignCare filed a mechanic's and materialman's lien
against the property of the Meah Project to collect unpaid invoices then totaling
$12,305.05. On December 14, 2001, DesignCare filed its answer and pled a
counterclaim against Meah Investments for its failure to pay those unpaid invoices. 
 Trial to the bench began on August 1, 2006. At trial, Meah Investments'
counsel questioned Andress about his architectural qualifications. Andress testified
that he was not an architect, did not have an architectural degree, and had never been
licensed as an architect. Andress also denied that he told Dr. Meah that he was an
architect at any time during their business relationship. He testified that he did not
manage DesignCare's invoices and was uncertain as to whether the billing to Meah
Investments was done prior to or after the billed work was completed. He also
testified that when he wrote to Dr. Meah that the architectural work was "close to
being completed," he was using the best information he had at the time of the
statement. 

 Horan, the designated architect for the Meah Project in the contract between
Meah Investments and DesignCare, testified in response to Meah Investment's
counsel's questions that he had no knowledge that Andress held himself out as an
architect to Dr. Meah. Horan also testified that he had previously made an affidavit
stating that he "was the architect on the project and performed or supervised all
aspects of contract negotiations and client contact with Dr. Meah of [Meah
Investments]." He also testified that he did not have any role in the contract
negotiations between DesignCare and Meah Investments. Horan testified that he did
the architectural work on the Meah Project and Andress did no architectural work on
the Meah Project. 

 Dr. Meah testified that, during their first conversation, Andress said that he was
a licensed architect. Dr. Meah also testified that Andress encouraged him to do
internet research on his background and experience. Dr. Meah testified that he used
the internet to research Andress's background and experience and discovered several
articles written by Andress that represented that Andress was a licensed architect with
a degree from the University of Houston. Dr. Meah testified that he relied on
Andress's experience throughout the course of the Meah Project because Andress had 
made a strong impression on him during their first conversation. 

 He testified that he and Andress negotiated the Meah Project contract and that
he never knew that Horan was involved with the Meah Project until after the contract
was terminated. Dr. Meah testified that he sent an e-mail to Andress on January 19,
2001 to document his conversations with Andress because DesignCare was delaying
its work and sent another e-mail on February 16, 2001 because he was "getting really
concerned that things [were] not being done." Dr. Meah testified that DesignCare
never delivered a set of construction documents for the Meah Project. He hired
another architect to complete the Meah Project and terminated the contract with
DesignCare. 

 On cross-examination, Dr. Meah testified that he did not receive any invoice
or make any payment to Andress individually. All invoices were sent from
DesignCare and all payments were made to DesignCare. He also testified that
"Morris Andress is DesignCare to me."

 On June 11, 2007, the trial court issued a judgment in favor of Meah
Investments that reads, in relevant part:

 After hearing all of the evidence and considering all of the evidence and
the argument of counsel on behalf of the parties, the Court was [sic] of
the opinion that Final Judgment in favor of the Plaintiff was proper. The
Court finds that Plaintiff, Meah Investments No. 2 Ltd., prevails against
the Defendants, DesignCare, Inc. and Morris Andress, jointly and
severally, on its claims against the Defendants, DesignCare, Inc. and
Morris Andress, for breach of contract. The Court also finds that the
Defendants, DesignCare, Inc. and Morris Andress, committed fraud
against the Plaintiff, Meah Investments No. 2 Ltd., and that Plaintiff is
entitled to judgment against the Defendants, DesignCare, Inc. and
Morris Andress, jointly and severally, on its claims against the
Defendants, DesignCare, Inc. and Morris Andress, for fraud. 


The trial court assessed $42,500 in compensatory damages; $25,000 in exemplary
damages; prejudgment interest; postjudgment interest; and $25,000 in attorneys' fees
against Andress and DesignCare. The trial court also issued a take-nothing judgment
in favor of Michael Horan.

 On July 2, 2007, Andress requested that the trial court issue findings of fact
and conclusions of law. On August 13, 2007, the trial court issued findings of fact,
that stated in relevant part: 

 3. A Defendant is [DesignCare, Inc.], a Texas Corporation
("[DesignCare]").


 4. A Defendant is Morris Andress, an individual ("Andress").


 5. At all relevant times, Morris Andress was president of
[DesignCare]. 


 . . . .


 11. Prior to entering the Agreement, Andress represented to Meah
and Nizam Meah that he was a professional registered architect.


 12. Prior to entering the Agreement, Andress represented to Meah
and Nizam Meah that he was qualified to perform the professional 
architectural services required by the Agreement.


 13. Prior to entering the Agreement, Andress and [DesignCare]
represented to Meah and Nizam Meah that [DesignCare] was a
registered architectural firm.


 14. Prior to entering the Agreement, Andress and [DesignCare]
represented to Meah and Nizam Meah that [DesignCare] was a
professional architectural firm that was qualified and capable of
performing the services called for by the Agreement in a timely
fashion.


 15. Prior to entering the Agreement, Andress directed Meah and
Nizam Meah to read and review published information about
[DesignCare] and Andress which represented that Andress had an
architectural bachelor's degree from the University of Houston
and that Andress had prior experience as a professional staff
architect with St. Joseph's Hospital in Houston.


 16. Andress requested that Meah rely upon the information and
representations set forth in findings 11, 12, 13, 14 and 15 above
in its consideration of whether to enter into the Agreement.


 17. Meah relied upon the information and representations set forth in
findings 11, 12, 13, 14 and 15 above in its consideration of
whether to enter into the Agreement.


 18. The information and representations set forth in findings 11, 12,
13, 14 and 15 above were material as they relate to the
Agreement.


 19. Meah was reasonable in its reliance upon the information and
representations set forth in findings 11, 12, 13, 14 and 15 above
in its consideration of whether to enter into the Agreement. 


 20. Meah entered into the Agreement in reliance upon the
information and representations set forth in findings 11, 12, 13,
14 and 15 above.


 21. Had Meah known that the information and representations set
forth in findings 11, 12, 13, 14 and 15 above were untrue, Meah
would not have entered into the Agreement. 


 22. The information and representations set forth in findings 11, 12,
13, 14, and 15 above were not true.


 23. Andress and [DesignCare] knew that the information and
representations set forth in findings 11, 12, 13 14, and 15 above
were not true at the time they were made and at the time
information was transmitted to Meah and Nizam Meah.


 24. Andress and [DesignCare] intended that Meah rely upon the
information and representations set forth in findings 11, 12, 13,
14 and 15.


 25. Had Meah or Nizam Meah known that Andress was not a degreed
and registered architect prior to entering into the Agreement,
Meah would not have entered into the Agreement.


 26. The Agreement was improper in that it was not signed on behalf
of [DesignCare] by an architect. 


 27. Meah timely performed all of its obligations pursuant to the
Agreement.


 28. Meah timely paid [DesignCare] $80,536.53 pursuant to the
Agreement for the services of Designcare and Andress. 


 . . . .


 33. Andress and [DesignCare] represented to Meah on January 19,
2001 that Andress and [DesignCare] were very close to being
completed with the project pursuant to the Agreement was false. 

 

 34. The representation to Meah on January 19, 2001 by Andress and
[DesignCare] that they were very close to being completed with
the project pursuant to the Agreement was false.


 35. When Andress and [DesignCare] made the representations in
findings 33 and 34 they knew that they were false.

 

 36. When Andress and [DesignCare] made the representations in
findings 33 and 34 they intended that Meah rely upon those false
representations.

 

 37. The representation[s] in findings 33 and 34 were material and
were reasonably relied upon by Meah. 


 38. Andress and [DesignCare] represented to Meah on January 19,
2001 that the Texas Department of Health had no problem with
the preliminary plan for the building renovation.

 

 39. The representation to Meah on January 19, 2001 by Andress and
[DesignCare] that the Texas Department of Health had no
problem with the preliminary plan for the building renovation was
false.


 40. When Andress and [DesignCare] made the representation in
findings 38 and 39 they knew that they were false.


 41. When Andress and [DesginCare] made the representations in
findings 38 and 39 they intended that Meah rely upon those
representations.


 42. The representation in findings 38 and 39 were material and were
reasonably relied upon by Meah.

 

 43. Andress and [DesignCare] represented to Meah on March 20,
2001 that drawings and plans had been completed.

 

 44. The representation to Meah on March 20, 2001 by Andress and
[DesignCare] that drawings and plans had been completed was
false.

 

 45. When Andress and [DesignCare] made the representations in
findings 43 and 44 they knew that they were false. 

 

 46. When Andress and [DesignCare] made the representations in
findings 43 and 44 they intended that Meah rely upon those false
representations.

 

 47. The representation in findings 43 and 44 were material and were
reasonably relied upon by Meah.


 . . . .


 51. [DesignCare] and Andress failed to provide the professional
services required in the Agreement for the remodeling of an
approximately 10,000 square foot building located at 109 Parking
Way in Lake Jackson, Texas (the "Building"). 


The trial court also issued conclusions of law, which stated in relevant part: 

 3. Defendants, [DesignCare] and Andress, committed actionable
fraud against the Plaintiff, Meah.


 4. Defendants, [DesignCare] and Andress, breached the Agreement
with Plaintiff, Meah. 


 5. Plaintiff, Meah, is entitled to judgment against Andress and
[DesignCare], jointly and severally, for its damages in the amount
of $42,750.00 as a result of the fraud committed by Defendants,
[DesignCare] and Andress.

 

 6. Plaintiff, Meah, is entitled to judgment against Andress and
[DesignCare], jointly and severally, for its damages in the amount
of $42,750.00 as a result of the breach of contract by Defendants,
[DesignCare] and Andress.

 

 7. Plaintiff, Meah, is entitled to judgment against Andress and
[DesignCare], jointly and severally, for its damages in the amount
of $25,000.00 as a result of Andress's and [DesignCare's]
conduct found by the Court.


 . . . .


 9. Plaintiff, Meah, is entitled to judgment against Andress and
[DesignCare], jointly and severally, for attorneys fees in the
amount of $25,000.00.


 . . . .


 11. Plaintiff, Meah, is entitled to judgment against Andress and
[DesignCare], jointly and severally, for pre-judgment interest on
damages of $42,750.00 from November 1, 2001 to date of
judgment.

 

 12. Plaintiff, Meah, is entitled to judgment against Andress and
[DesignCare], jointly and severally, for post-judgment interest on
the entire amount of the judgment from the date of judgment until
paid in full.

Personal Liability for Corporate Fraud 

 In his third issue, Andress argues that there is legally insufficient evidence to
support the trial court's conclusion of law that he committed fraud against Meah
Investments. 

 Standard of Review

 A trial court's findings of fact are reviewable for legal sufficiency of the
evidence by the same standards that are applied in reviewing evidence supporting a
jury's answer. Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994); DeClaire v. G
& B McIntosh Family Ltd. P'ship, 260 S.W.3d 34, 43 (Tex. App.--Houston [1st
Dist.] 2008, no pet.). When challenged, findings of fact are not conclusive if, as here,
there is a complete reporter's record. DeClaire, 260 S.W.3d at 43; In re K.R.P., 80
S.W.3d 669, 673 (Tex. App.--Houston [1st Dist.] 2002, pet. denied). When there is
a reporter's record, the trial court's findings of fact are binding only if supported by
the evidence. In re K.R.P., 80 S.W.3d at 673. In analyzing legal sufficiency, we
consider only the evidence and inferences tending to support the challenged finding
and disregard all inferences to the contrary. Min v. Avila, 991 S.W.2d 495, 500 (Tex.
App.--Houston [1st Dist.] 1999, no pet.). 

 Fraud

 Elements of common-law fraud are that (1) a material representation was made;
(2) the representation was false; (3) when the speaker made it he knew it was false or
made it recklessly without any knowledge of its truth and as a positive assertion; (4)
the speaker made it with the intention that it should be acted upon by the party; (5)
the party acted in reliance on it ; and (6) he thereby suffered injury. In re FirstMerit
Bank, N.A., 52 S.W.3d 749, 759 (Tex. 2001). To establish the element of causation
in a fraud claim, a plaintiff must show that the defendant's acts or omissions were a
cause-in-fact of foreseeable losses. Prospect High Income Fund, ML CBO IV v.
Grant Thorton, LLP, 203 S.W.3d 602, 618 (Tex. App.--Dallas 2006, pet. denied)
(citing Marathon Corp. v. Pitzner, 106 S.W.3d 724, 727 (Tex. 2003)). The
defendant's acts or omissions are a cause-in-fact if the plaintiff can show, beyond
mere conjecture, guess, or speculation, that an act or omission was a substantial factor
in bringing about an injury which would not otherwise have occurred. Id. A plaintiff
establishes reliance in a fraud claim by showing that the defendant's acts and
representations induced it to either act or refrain from acting, to its detriment. Id. 

 Fraudulent inducement is a particular species of fraud that arises only in the
context of a contract and requires the existence of a contract as part of its proof. 
Haase v. Glazner, 62 S.W.3d 795, 798 (Tex. 2001); Clark v. Power Mktg. Direct,
Inc., 192 S.W.3d 796, 799 (Tex. App.--Houston [1st Dist.] 2006, no pet.). That is,
with a fraudulent inducement claim, the elements of fraud must be established as they
relate to an agreement between the parties. Haase, 62 S.W.3d at 798-99. 

 Here, Meah Investments presented testimony from Dr. Meah stating that
Andress represented himself as a licensed architect with a degree from the University
of Houston. Dr. Meah also testified that Andress told him to do internet research to
verify Andress's claims about his background. Dr. Meah testified that he did internet
research and discovered several articles written by Andress representing that Andress
was a licensed architect with a degree from the University of Houston. He relied on
the information given to him by Andress to make his decision to sign a contract with
DesignCare. 

 Meah Investments also presented testimony from Dr. Meah stating that he paid
for work that Andress and DesignCare never completed. Dr. Meah also testified that
Andress told him that the work was near completion in January 2001 and continued
to represent that the work was either near completion or at completion until the
termination of the contract. Meah Investments also presented invoices from
DesignCare, of which Andress was president, showing that the company billed Meah
Investments for $61,749.26 in completed architectural work by January 2001, which
Meah Investments timely paid, as required under the contract terms. Meah
Investments presented a job detail report showing that DesignCare had completed
only $10,169.11 worth of work by January 2001. Considering only the evidence and
inferences tending to support the trial court's conclusion that Andress committed
actionable fraud based on its finding, we hold that the evidence is legally sufficient
to support the trial court's finding. See DeClaire, 260 S.W.3d at 43; see also Min,
991 S.W.2d at 500.

 We overrule Andress's third issue.

Breach of Contract

 In his second issue, Andress argues that the trial court erred as a matter of law
in finding and concluding that he was personally liable for breach of the contract
between DesignCare and Meah Investments because he was not in privity of contract
with Meah Investments. Specifically, Dr. Meah argues that Andress breached the
contract by failing to provide the architectural services required under the contract. 
Because we have already held that the evidence was legally sufficient to support the
judgment against Andress for fraud, we need not consider whether he was liable for
breach of contract. 

 We overrule Andress's second issue.

Capacity

 In his first issue, Andress argues that the trial court erred in finding him
personally liable for the acts of DesignCare because there was no evidence that he
was acting outside his capacity as an employee of DesignCare. We construe his
argument as contending there is no evidence, i.e., legally insufficient evidence, to
support the trial court's findings of fact numbers 11, 12, 13, 14, 15, 16, 18, 19, 22, 23,
24, 25, 33, 34, 35, 36, 38, 39, 40, 41, 43, 44, 45, 46, 51 and conclusions of law
numbers 3 and 4 that Andress personally committed actionable fraud against Meah
Investments and breached the Agreement with Meah Investments. 

 Because we have held that the evidence is legally sufficient to support the trial
court's conclusion of law number 3 that Andress committed actionable fraud against
Meah Investments, we need not address this issue. See DeClaire, 260 S.W.3d at 43;
see also Min, 991 S.W.2d at 500.

 We overrule Andress's first issue. 

Proof of Exemplary Damages

 In his fourth issue, Andress argues that the trial court erred as a matter of law
in awarding Meah Investments exemplary damages because there was no evidence
or insufficient evidence that Andress committed fraud. 

 Exemplary damages are "levied against a defendant to punish the defendant for
outrageous, malicious, or otherwise morally culpable conduct." Tex. Civ. Prac. &
Rem. Code Ann. § 41.001(5) (Vernon 2008); Transportation Ins. Co v. Moriel, 879
S.W.2d 10, 16 (Tex. 1994). Unless otherwise provided by statute, exemplary
damages may be awarded only if the claimant proves by clear and convincing
evidence that the harm with respect to which the claimant seeks recovery of
exemplary damages results from (1) fraud; (2) malice; or (3) gross negligence. Tex.
Civ. Prac. & Rem. Code Ann. § 41.003(a) (Vernon 2008); see also In re Barnes,
369 B.R. 298 (Bankr. W.D. Tex. 2007).

 Whenever the standard of proof at trial is elevated, the standard of appellate
review must likewise be elevated. S.W. Bell Tel. Co. v. Garza, 164 S.W.3d 607, 627
(Tex. 2004) (citing In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the
evidence for legal sufficiency to support a finding that must be proved by clear and
convincing evidence, we must look at all the evidence in the light most favorable to
the finding to determine whether a reasonable trier of fact could have formed a firm
belief or conviction that its finding was true. Diamond Shamrock Ref. Co v. Hall, 168
S.W.3d 164, 170 (Tex. 2005); Garza, 164 S.W.3d at 627. To give appropriate
deference to the fact-finder's conclusions and the role of a court conducting a legal
sufficiency review, we must assume that the fact-finder resolved any disputed facts
in favor of its finding if a reasonable fact-finder could have done so. Hall, 168
S.W.3d at 170.

 We must also disregard all evidence that a reasonable fact-finder could have
disbelieved or found to be incredible. Hall, 168 S.W.3d at 170; Garza, 164 S.W.3d
at 627. If we determine that no reasonable fact-finder could form a firm belief or
conviction that its finding was true, then we must conclude that the evidence is
legally insufficient. Hall, 168 S.W.3d at 170; Garza, 164 S.W.3d at 627.

 We have previously held that there was legally sufficient evidence to prove that
Andress committed fraud against Meah Investments. Based on the record before us,
we conclude that the trial court could have reasonably formed a firm belief that the
harm suffered by Meah Investments resulted from Andress's fraud. See Hall, 168
S.W.3d at 170; Garza, 164 S.W.3d at 627. Therefore, we hold that the trial court's
findings of fact satisfied the clear and convincing standard necessary to impose
exemplary damages upon Andress. Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a);
Hall, 168 S.W.3d at 170; Garza, 164 S.W.3d at 627. 

 We overrule Andress's fourth issue.

Exemplary Damages Specific to Defendant

 In his fifth issue, Andress argues that the trial court erred as a matter of law in
failing to specify the amount of exemplary damages assessed for each of the
defendants at trial. 

 "In any action in which there are two or more defendants, an award of
exemplary damages must be specific as to a defendant, and each defendant is liable
only for the amount of the award made against that defendant." Tex. Civ. Prac. &
Rem. Code Ann. § 41.006 (Vernon 2008); Computek Computer & Office Supplies,
Inc. v. Walton, 156 S.W.3d 217, 224 (Tex. App.--Dallas 2005, no pet.) (statute
prohibited trial court from awarding exemplary damages jointly and severally against
former employee and his company in former employer's action for misappropriation
of trade secrets and other claims, even if former employee and his company were
closely related). 

 Here, the trial court made the following conclusion of law regarding exemplary
damages: 

 7. Plaintiff, Meah, is entitled to judgment against Andress and
DesignCare, jointly and severally, for its damages in the amount
of $25,000.00 as a result of Andress's and Designcare's conduct
found by the Court. 


 The trial court failed to assess exemplary damages to Andress and DesignCare
separately, as required by the Texas Civil Practices and Remedies Code. See Tex.
Civ. Prac. & Rem. Code Ann. § 41.006; Computek, 156 S.W.3d at 224. Rather, the
trial court erred as a matter of law by improperly assessing exemplary damages
against Andress and DesignCare jointly and severally. 

 We sustain Andress's fifth issue, reverse the judgment on this issue and remand
the case to the trial court to determine the exemplary damages, if any, assessed
against Andress individually. 

Conclusion

 We affirm in part, reverse in part, and remand the case to the trial court for
further proceedings consistent with this opinion. 





 Evelyn V. Keyes

 Justice


Panel consists of Justices Jennings, Keyes, and Higley.