Opinion issued August 3, 2006
     









In The
Court of Appeals
For The
First District of Texas




NO. 01-05-00185-CV




BOONDOGGLES CORPORATION, Appellant

V.

JOHNATHAN F. YANCEY, Appellee




On Appeal from the 234th District Court
Harris County, Texas
Trial Court Cause No. 2002-31521




MEMORANDUM OPINION
          Appellant, Boondoggles Corporation (Boondoggles or the corporation)
challenges a judgment that awarded appellee, Johnathan F. Yancey, actual damages,
attorney’s fees, and costs for his claim that Boondoggles breached its employment
contract by not paying him the bonus of three percent of net sales specified in the
contract. Trial was to the court, which filed findings of fact and conclusions of law. 
In six points of error, Boondoggles contends that it did not owe a bonus to Yancey
as a matter of law, because an oral condition precedent to receiving a bonus was
never fulfilled; that the trial court erred by awarding damages for month in which
Yancey worked only part of that month and by calculating “net sales” as gross sales
minus sales taxes collected; that the award of attorney’s fees must be reversed
because Yancey did not properly designate his counsel as an expert witness; that the
trial court erred by concluding that the contract was not ambiguous; and that res
judicata barred Yancey’s claims as a matter of law. We affirm.
Facts and Procedural History
          Boondoggles is a microbrewery and restaurant in the Clear Lake area of
Houston. Boondoggles hired Yancey as general manager of the restaurant’s
operations in July 1999. The corporation had been experiencing financial difficulties,
and Yancey was hired because of his experience in managing a similar restaurant, in
particular, his skills in limiting theft, tracking and monitoring inventory, and
managing staff. The president and secretary of Boondoggles joined Yancey in
signing the employment contract on July 21, 1999, but neither the president nor the
secretary testified at trial. 
          Yancey’s contract with the corporation confirmed a base salary of $35,000 for
the year beginning on July 12, 1999 and ending on July 11, 2000 and provided for
renegotiation before July 11, 2000 “to increase the base salary and bonus, based on
business growth and productivity.” The contract specified that benefits included, but
were not limited to, the following:
•Monthly bonus of 3% of net sales
•Two weeks paid vacation after one year of employment
•Medical insurance (full coverage upon obtaining medical
insurance by Boondoggles Corp.)
•Monthly expenses for cellular phone
•Automobile mileage for business-related expenses.

The terms of the single-page contract also proscribed any modification of the contract
unless made in writing and signed by the parties. The contract did not define the term
“net sales.”
          While employed at Boondoggles, Yancey became a sixth shareholder-director
of the closely held corporation. The board later added three additional shareholders.
Yancey’s responsibilities included on-site management at the Boondoggles restaurant
for an average of 60 hours weekly and drafting checks for all expenses and salaries,
including his own. He also kept the corporation’s books until January 2000, when
Boondoggles hired an independent company for that work. It is undisputed that
Yancey never wrote a bonus check to himself while working for the corporation. 
          When asked at trial why he did not draft checks payable to himself to pay the
bonus due, Yancey cited an agreement among the shareholders, which included him,
to defer payment pending an improved financial outlook. Yancey also explained that
payment of his bonus had become a “sticking point” with the board, beginning in
October 1999. He attested, however, to discussions with other board members in
January 2000, in response to the board’s requests for an accounting of funds or debts
owed to Yancey. Yancey claimed that he disclosed $40,000 to $50,000 owed to him,
which included his unpaid bonuses, as well as debts for reimbursement for personal
equipment and supplies Yancey brought into the corporation. Yancey affirmed that
his discussions with board members about debts encompassed bonus payments owed
to him and others, in addition to requests for reimbursement for his equipment and
supplies, but the Boondoggle representatives who testified at trial denied any request
relating to Yancey’s bonus. 
           Boondoggles continued to experience financial problems, and the board
considered liquidating in December 1999. By June 2000, the corporation was still
losing money and had not turned a profit. On June 11, 2000, the board of directors
notified Yancey of its decision not to renew his contract. Yancey acknowledged
receiving this notice, but contended that he did not receive a written notice, dated the
same day, which asked Yancey for a statement of amounts the company owed to him. 
The record contains a copy of the notice, but there is no record evidence that Yancey
responded to the notice, and it is undisputed that Yancey did not request payment of
his bonus before leaving Boondoggles. 
          Later in 2002, Yancey joined two other shareholders as plaintiffs in a
shareholder-oppression action against the three majority shareholders whose shares
at the time totaled 67%. The plaintiffs sought a declaration of their respective
ownership interests in the Boondoggles coporation, actual and punitive damages, and
attorney’s fees; the majority shareholders filed counterclaims. The bench trial before
the same trial court that presided over the instant case resulted in no damages, with
each side bearing its own fees and costs, but the trial court’s judgment recites a
declaration of the amount and percentage of shares owned by each of the nine
shareholders. With respect to Yancey, the April 4, 2002 judgment declared his
ownership interest as 24,330 shares, or 1.3268 percent Boondoggles’ total shares. 
The defendants in the instant case were declared majority shareholders whose interest
totaled 63 percent. 
          Shortly after the shareholder action concluded, and after Yancey unsuccessfully
demanded payment of Boondoggles pursuant to the bonus and vacation-pay
provisions of his employment contract, he filed this action on the contract. The case
was transferred to the trial court on Boondoogles’ motion. Boondoggles’ answer to
Yancey’s petition included claims of res judicata, mutual mistake and fraud. 
Boondoggles sought summary judgment on res judicata, but did not prevail. 
          The trial court ruled in Yancey’s favor and awarded him $25,265.20 in actual
damages on his claim for unpaid bonuses, and $16,000.00 for attorney’s fees, in
addition to interest and costs; Yancey did not prevail on his claim for unpaid vacation
benefits. The trial court filed findings of fact and conclusions of law, to which
Boondoggles excepted by requesting additional findings and conclusions. 
Boondoggles perfected its appeal and filed a cashier’s check in the amount of
$43,672.38 in lieu of a supersedeas bond.
Standard of Review
          Five of Boondoggles’ six points of error challenge the trial court’s findings of
fact and conclusions of law. The trial court’s conclusions of law are reviewable de
novo as legal questions. State v. Heal, 917 S.W.2d 6, 9 (Tex. 1996); McDermott v.
Cronin, 31 S.W.3d 617, 623 (Tex. App.—Houston [1st Dist.] 2000, no pet.). 
Conclusions of law will be upheld if the judgment can be sustained on any legal
theory supported by the evidence unless they are clearly erroneous. Tex. Dep’t of
Pub. Safety v. Stockton, 53 S.W.3d 421, 423 (Tex. App.—San Antonio 2001, no pet.). 
          Findings of fact in a case tried to the court have the same force and effect as
a jury’s verdict on questions and are reviewable for legal and factual sufficiency. 
Anderson v. City of Seven Points, 806 S.W.2d 791, 794 (Tex. 1991); Min v. Avila, 991
S.W.2d 495, 500 (Tex. App.—Houston [1st Dist.] 1999, no pet.). When, as here, the
appellate record contains a complete reporter’s record of the trial, the trial court’s fact
findings are not conclusive, but subject to the same, well-settled standards that govern
legal and factual sufficiency challenges to jury findings. Comm’n of Contracts of the
Gen. Executive Comm. of the Petroleum Workers Union v. Arriba, Ltd., 882 S.W.2d
576, 582 (Tex. App.—Houston [1st Dist.] 1994, no writ); In the Interest of M.J.Z.,
874 S.W.2d 724, 728 (Tex. App.—Houston [1st Dist.] 1994, no writ). 
          In determining legal sufficiency, therefore, we apply the analysis recently
stated by the supreme court in City of Keller v. Wilson, 168 S.W.3d 802 (Tex. 2005),
in which the court concluded that “[t]he final test for legal sufficiency must always
be whether the evidence at trial would enable reasonable and fair-minded people to
reach the verdict under review.” Id. at 827. “[L]egal-sufficiency review in the proper
light must credit favorable evidence if reasonable jurors could, and disregard contrary
evidence unless reasonable jurors could not.” Id. We may not substitute our
judgment for that of the trier-of-fact, here the trial court, however, when the evidence
falls within a zone of reasonable disagreement, and although we must “consider
evidence in the light most favorable to the judgment, and indulge every reasonable
inference that would support it . . . , [i]f the evidence allows of only one inference,
neither [the trier-of-fact] nor the reviewing court may disregard it.” See id. at 822,
827.
          In determining factual sufficiency, we must weigh all the evidence, both
supporting and conflicting, and may set the finding aside only if it is so contrary to
the overwhelming weight of the evidence as to be clearly wrong and manifestly
unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); In re King’s Estate, 244
S.W.2d 660, 661 (Tex. 1951); Arriba, 882 S.W.2d at 582. 
          Several of Boondoggles’ points of error also require that we analyze Yancey’s
employment contract with Boondoggles. Courts construe contracts as a matter of law
and enforce an unambiguous contract as written. See SAS Inst., Inc. v. Breitenfeld,
167 S.W.3d 840, 841 (Tex. 2005) (quoting Coker v. Coker, 650 S.W.2d 391, 393
(Tex. 1983)); Lopez v. Muñoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 862 (Tex.
2000). A basic rule of contract law requires courts to give plain meaning to the words
used in the writing. See City of Pinehurst v. Spooner Addition Water Co., 432
S.W.2d 515, 518-19 (Tex. 1968). Our primary concern in construing a written
contract is to ascertain the true intent of the parties as expressed in the instrument. 
Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133 (Tex. 1994); Coker, 650 S.W.2d
at 393. In interpreting a written contract to ascertain the parties’ intent, we must
examine and consider the entire writing in an effort to harmonize and give effect to
all provisions of the contract so that none will be rendered meaningless. Coker, 650
S.W.2d at 393; Universal C.I.T. Credit Corp. v. Daniel, 243 S.W.2d 154, 158 (Tex.
1951). Thus, no single provision taken alone will be given controlling effect, and all
provisions must be considered with reference to the whole instrument. Coker, 650
S.W.2d at 393; Myers v. Gulf Coast Minerals Mgmt. Corp., 361 S.W.2d 193, 196
(Tex. 1962). 
A.      Challenge to Yancey’s Entitlement to Bonus
          Boondoggles’ first point of error challenges the trial court’s conclusions of law
one and seven and its eighth finding of fact, which state,
Conclusions of Law:
1.Boondoggles Corp. is indebted to Johnathan F. Yancey in the
amount of $25,265 representing 3% of net sales during his
employment.
 
7.Johnathan F. Yancey’s right to collection of his indebtedness is
due. 
 
Finding of Fact
 
8.Boondoggles failed to pay Johnathan F. Yancey his monthly
bonus of 3% of net sales for any of the months that he was
employed.

          Boondoggles challenges these rulings on several grounds, in particular through
Yancey’s trial testimony that he could, but never did, write himself a bonus check;
testimony by Dominic Gelfo, a shareholder who stated that the board did not plan “on
making an incentive program” until “we were making money”; and minutes of the
“informal” July 5, 1999 board meeting held to address hiring Yancey’s hiring.


 In
addition to noting Yancey’s qualifications and his willingness “to work at least 60 hrs
a week,” the July 5, 1999 minutes recite that Yancey “will start for $35,000 with
expenses and then when business improves an incentive program . . . . We discussed
3% of net as the incentive.” 
          None of this testimony, however, alters the terms of the employment contract
that Yancey signed after the informal board meeting cited above, on July 21, 1999,
and that the president and the secretary of the Boondoggles corporation also signed. 
These terms state that benefits “shall include, but are not limited to . . . [m]onthly
bonus of 3% of net sales.” In addition, the contract refers to the bonus a second time 
by referring to both the bonus and the base salary as terms to be renegotiated before
the single-year contract expired. Although Boondoggles disputes the meaning of “net
sales” in this contract, the corporation has never disputed that the face of the contract
mandates the payment or claimed that it paid Yancey’s bonus. Similarly, Gelfo’s
recollection of the board’s “intent” before the contract was signed does not alter the
undisputed terms of the contract that both sides signed, which negate that intent by
imposing no conditions on Yancey’s receiving a bonus. Instead, the terms mandate
that benefit. See Forbau, 876 S.W.2d at 133; Coker, 650 S.W.2d at 393
          Boondoggles further emphasizes that Yancey did not write any bonus checks
to himself, although, as manager, he could have, to support its contention that Yancey
had “entered into an oral agreement with the board directors that his bonus was not
due until such time as Boondoggles had the ability to fund the payment” and,
therefore, that Yancey and the board had agreed to a condition precedent, specifically,
a sufficiently solvent financial status for the corporation, that would have to occur
before Boondoggles had any duty to pay Yancey his bonus. Because that condition
precedent never occurred, Boondoggles argues that its indebtedness never became
due, despite Yancey’s pretrial demand.
          A condition precedent is an event that must happen or be performed before a
right can accrue to enforce an obligation. Centex Corp. v. Dalton, 840 S.W.2d 952,
956 (Tex. 1992). Contract law recognizes two types of conditions precedent: those
that must occur before a contract can be considered formed and those that must occur
before an obligation to perform an existing agreement can occur. Hohenberg Bros.
v. George E. Gibbons & Co., 537 S.W.2d 1, 3 (Tex. 1976). Boondoggles argues that
a condition precedent to performance not only arose in this case, but also absolved
the corporation of any duty to pay because the requisite financial solvency never
occurred. Because Yancey’s pleadings stated that all conditions precedent to
receiving the bonus had occurred, and because Boondoggles answered in part by
disputing that all conditions precedent had occurred, Boondoggles argues that Yancey
had the burden to prove compliance with all conditions precedent. See Tex. R. Civ.
P. 54; Betty Leavell Realty Co. v. Raggio, 669 S.W.2d 102, 104 (Tex. 1984) (stating
that plaintiff must prove satisfaction of condition precedent when defendant disputes
that assertion). 
          Boondoggles contends that the following response by Yancey, when his trial
counsel inquired why Yancey wrote no bonus checks to himself, underscores its
condition-precedent theory:
I didn’t write my bonus checks for the reason being, it was agreed upon
with the Board of Directors and with Steve Roberts and Dave Glover,
which were the president and secretary of the corporation, whom [sic]
it was discussed that the corporation was not able to pay those bonuses.
 
And so, we agreed upon when the corporation and also, I had become a
shareholder as well, [a]nd knowing if I paid myself, then, it would send
the company, you know, even more in the negative. And so, it was
agreed upon by the board that I would hold off my bonuses until the
corporation was able to take care of those responsibilities. 
 
[Emphasis added.] Boondoggles supports its interpretation of Yancey’s testimony
by emphasizing that Yancey ignored two invitations to submit a statement of debts
owed by the corporation. 
          But, in merely agreeing to “hold off,” or defer, payment of Boondoggles’
indebtnedness, Yancey did not agree to modify the terms of his contract of
employment by adding a condition to the otherwise unconditional and unambiguous
statement of indebtedness stated in that contract. See Okemah Const., Inc. v. Barkley-Farmer Inc., 583 S.W.2d 458, 460 (Tex. Civ. App.—Houston [1st Dist.] 1979, no
writ). To be effective, a modification must be supported by additional consideration,
which was not shown here. See id. (stating that agreeing to do what is already
required does not constitute new consideration). Moreover the terms of the contract
here expressly state that any modification would have to be in writing and signed by
both Yancey and the corporation to be effective. We agree with Yancey, who
contends, as in the trial court, that Boondoggles had the burden to prove that the
parties had modified Yancey’s employment contract and had supported that
modification with new consideration, see Okemah Const., Inc., 583 S.W.2d at 460,
and through sufficiently ascertainable terms that would enable the court construing
the agreement to determine the parties’ obligations, see T.O. Stanley Boot Co. v. Bank
of El Paso, 847 S.W.2d 218, 221 (Tex. 1992), which burden Boondoggles did not
meet. 
          In addition, as Yancey explained in the excerpt of his testimony quoted above,
his decision not to pay himself a bonus derived from his status as a shareholder in fall
1999, whose first responsibility was to the corporation, rather than his status as an
employee when he first signed the contract. The record reflects that when the board
considered liquidation in January 2000, Boondoggles’s debts totaled between
$40,000 and $50,000. Accordingly, any decision by Yancey to pay himself the bonus
owed would have conflicted with his shareholder duties to the corporation by
compounding its financial difficulties. See generally Int’l Bankers Life Ins. Co. v.
Holloway, 368 S.W.2d 567, 577 (Tex. 1963) (stating that corporate officer’s fiduciary
duty encompasses duty not to usurp corporate opportunities for personal gain). 
Yancey further explained, moreover, that all check drafting he performed as manager
was subject to the approval of the board of directors and that he “could not do
anything” without board approval.
          Boondoggles’ emphasis on Yancey’s alleged failure to include the bonus owed
in two requests for indebtedness also fails to preclude Yancey’s entitlement to the
bonus as a matter of law. Yancey contested Boondoggles’ assertion by describing
several informal discussions with board members that addressed the as-yet-unpaid
bonus and stated that the bonus had become a “sticking point” with the board. With
respect to Boondoggles’ claim that it had twice requested a listing of debts owed,
Yancey acknowledged the corporation’s first, oral request, which coincided with the
possible liquidation of Boondoggles in January 2000. According to Yancey, his
response to the request included not only the personal brewing equipment and
supplies that he had brought into the business, but also his own and others’ unpaid
bonuses. Yancey disputed ever receiving Boondoggles second, written request in
June 2000 for a statement of funds owed. 
          On reviewing the contentions of both parties within the confines of the record
and the applicable standards of review, we conclude that, in construing the contract
as a matter of law, the trial court impliedly concluded that no condition precedent to
performance of the duty to pay Yancey his bonus had arisen and, therefore, that
Boondoggles did not meet its burden to establish that the parties had modified the
terms of Yancey’s employment contract, which, we further note, expressly forbade
all but written and agreed-upon modifications. See Okemah Const. Inc., 583 S.W.2d
at 460. This implied legal conclusion supports the trial court’s express conclusion
number one, that Boondoggles is indebted to Yancey.


 Boondoggles’ challenge to
the trial court’s eighth fact finding, which states that Boondoggles failed to pay
Yancey his monthly bonus while he was employed, is premised, in turn, on
Boondoggles’ oral condition-precedent and modification theories, which we have
rejected, and therefore lacks merit. Because the only inference permitted by the
record is that Boondoggles did not pay Yancey the bonus required by his contract, we
may not disregard that evidence and therefore hold that the evidence is legally
sufficient to support the trial court’s eighth fact finding. See City of Keller, 168
S.W.3d at 827. Having reviewed the record, we further find that this finding is not
so contrary to the overwhelming weight of the evidence as to be clearly wrong and
manifestly unjust. See Cain, 709 S.W.2d at 176.
          Having concluded that the trial court properly found that Boondoggles never
paid Yancey the bonus required by his contract of employment and that Yancey
demanded payment before filing this action, the trial court correctly ruled, in
conclusion of law seven, that Yancey’s right to collect was due. 
          We overrule Boondoggles’ first point of error.
B.      Challenge to Calculation of Damages Due
          1.       Remittitur for Miscalculation?
          In its second point of error, Boondoggles further challenges conclusion of law
one on the grounds that the total of damages awarded results from miscalculation and
requires a remittitur because the award includes payment for the full month of July
1999, but Yancey did not begin working until July 12, 1999. The total of damages,
however, is premised on finding of fact nine, which Boondoggles also challenges and
which states, “Three percent of net sales for the period of July 12, 1999 to July 12,
2000, calculates to $25,265.20.” Yancey explained at trial that his calculation of
damages included the first 11 days of July 1999, when he admittedly did not work,
but excluded the first 11 days of July 2000, when he did. Boondoggles contends that
there is no basis on which to assume that the calculations for each of those time
periods are interchangeable and, therefore, that there is nothing from which the trial
court could have calculated the amount of sales for July 2000. Yancey disagrees; we
agree with Yancey.
          It is undisputed that all damages calculations derived from Yancey’s trial
exhibit five. Exhibit five, however, is derived, in turn, from Yancey’s trial exhibit
four, which consists of State of Texas sales-tax records. The table or chart of exhibit
five includes a month-by-month calculation of total sales and total sales taxes. As
Yancey acknowledged, the table includes the month of July 1999, but omits the
month of July 2000. Despite Boondoggles’ contention that the trial court had no
evidence from which to determine Yancey’s three percent commission for July 2006,
the state-sales-tax records that are the source of the data in the table, include statistics
for all months of the year 2000. According to these records, Boondoggles’ sales for
July 2000 totaled $83,196.00, which incurred a tax liability of $2,035.55, and a net-sale total of $81,160.45. At the rate of three percent, the net-sale total resulted in a
bonus for the entire month of $2,434.81. Reducing that total proportionally for 11 out
of 31 days in July that Yancey worked results in a bonus due of $863.96. Yancey’s
calculations in his trial exhibit four, however, which are premised on the July 1999
sales-tax records, result in a total of only $826.60. In short, the calculations that
Boondoggles challenges actually benefitted Boondoggles by requesting a lesser
bonus than was due. 
          We overrule Boondoggles’ second point of error. 
          2.       Meaning of “Net Sales”
          Point of error four challenges the trial court’s fourth fact finding, which states,
“Net sales means gross sales minus sales taxes collected.” This finding is crucial to
Yancey’s case because the three percent bonus due Yancey was calculated based on
that definition. The record reflects that Boondoggles conceded in its motion for new
trial that the trial court relied on the table shown on Yancey’s trial exhibit five in
awarding damages. This table calculates “net sales” as the remainder after
subtracting sales tax from total sales. In the same motion, Boondoggles
acknowledged that the “evidence of what constituted “net sales[,]” . . . the term used
in the parties’ contract, came only from [Yancey]. 
          Boondoggles, however, offered no evidence on the meaning of “net sales” and
instead mounted legal arguments during opening statements before the trial court and
in an objection to testimony by Yancey that his method of calculating net sales was
common in the restaurant industry. The trial court sustained the objection by
Boondoggles that Yancey was not qualified as an expert in the accounting or
restaurant business. Yancey later explained, however, that the corporation commonly
used the term to refer to sales after taxes and also referred to the financial reports
prepared by the accounting firm that took over Yancey’s role as bookkeeper. 
Boondoggles prevailed initially on a hearsay objection to testimony derived from the
reports, but the trial court permitted Yancey’s counsel to solicit testimony for the
limited purpose of demonstrating that the corporation’s financial reports used the
term “net sales” in the same manner proposed by Yancey. Moreover, in response to
cross-examination questions by Boondoogles, Yancey twice testified that “net sales,” 
as referred to in his contract, meant “sales after taxes.”
          The trial court confronted Boondoggles with its failure of proof during
Boondoggles’ counsel’s final argument, by asking three times whether Boondoggles
had put on evidence of the meaning of net sales, and, if so, what that evidence was.



Boondoggles first claimed that Yancey had the burden to establish the term and then
claimed that the record was inconclusive on the meaning of the term. Twice
confronted with “That’s not what I asked” responses by the trial court, Boondoggles’
counsel conceded that the corporation had provided “no testimony whatsoever . . .”
and reiterated its theory that lack of any profit precluded any bonus due. 
          Having reviewed the record within the confines of the applicable standard of
review, we conclude that the only inference permitted by the only evidence before the
trial court is that “net sales” meant total sales minus sales taxes for purposes of
calculating Yancey’s three-percent bonus. Just as the trial court could not disregard
that evidence, we may not disregard it and therefore hold that the evidence is legally
sufficient to support the trial court’s fifth fact finding. See City of Keller, 168 S.W.3d
at 827. We further find that this finding is not so contrary to the overwhelming
weight of the evidence presented to the trial court as to be clearly wrong and
manifestly unjust. See Cain, 709 S.W.2d at 176.
          We overrule Boondoggles’ fourth point of error.
C.      Alternative Challenge to Conclusion that Contract Not Ambiguous
          In its fifth point of error, Boondoggles raises an alternative challenge to the
trial court’s ninth conclusion of law, which states that Yancey’s employment contract
was not ambiguous. Boondoggles argues that the meaning of the term “net sales”
rendered Yancey’s employment contract ambiguous and that we must, therefore,
remand the cause for a new trial to determine the meaning of the term. 
          We review the trial court’s conclusion of no ambiguity de novo. Heal, 917
S.W.2d at 9; see MJR Corp. v. B&B Vending Co., 760 S.W.2d 4, 10 (Tex.
App.—Dallas 1988, writ denied). A court may analyze a contract for ambiguity even
when, as here, neither party has raised the issue in its pleadings. See Sage Street
Assocs. v. Northdale Constr. Co., 863 S.W.2d 438, 445 (Tex. 1993); Sun Oil Co. v.
Madeley, 626 S.W.2d 726, 731-32 (Tex. 1981); City of Pinehurst, 432 S.W.2d at
518–19.
          Whether a contract is ambiguous is a question that the court decides as a matter
of law by examining the contract as a whole in light of the circumstances present
when it was executed. J.M Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex.
2003); Lenape Resources Corp. v. Tenn. Gas Pipeline Co., 925 S.W.2d 565, 574
(Tex. 1996). If, after applying the pertinent rules of construction to the face of the
contract, the court concludes that the contract is subject to two or more reasonable
interpretations, the contract is ambiguous. See Universal C.I.T. Credit Corp. v.
Daniel, 243 S.W.2d 154, 157 (Tex. 1951); see also JM Davidson, Inc., 128 S.W.3d
at 229 (concluding that arbitration agreement ambiguous because court could not
determine from face of agreement whether clause affording employer unilateral right
to abolish or modify “personnel policies” applied to arbitration agreement itself so
that it, too, was a “personnel policy”). A contract is not ambiguous, however, simply
because the parties offer conflicting interpretations of its terms. Am. Mfrs. Mut. Ins.
Co. v. Schafer, 124 S.W.3d 154, 157 (Tex. 2003); Lopez, 22 S.W.3d at 861; Columbia
Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996). 
An ambiguity arises only if both interpretations are reasonable. Columbia Gas
Transmission Corp., 940 S.W.2d at 589 (emphasis in original).
          Settled law recognizes the trial court’s authority to hear and consider extrinsic
evidence of the circumstances surrounding the formation and execution of the
contract and to apply the rules of contract construction when the parties to a contract
offer competing interpretations. See Columbia Gas Transmission Corp., 940 S.W.2d
at 591; Sun Oil Co., 626 S.W.2d at 731-32; City of Pinehurst, 432 S.W.2d at 518-19. 
The extrinsic evidence offered to the court does not necessarily create a triable issue
of fact concerning the parties’ intent in forming the contract. See Columbia Gas
Transmission Corp., 940 S.W.2d at 592 (holding that extrinsic evidence of
circumstances surrounding execution of contract did not give rise to triable issue of
fact regarding parties’ intent). Extrinsic evidence is admissible to clarify, explain, or
give meaning to terms of a contract that are facially incomplete, provided the
evidence does not attempt to provide essential terms or vary or contradict other terms
of the contract that are unambiguous, complete, and final. See Tex. Builders v. Keller,
928 S.W.2d 479, 481 (Tex. 1996); Warren Bros. v. A.A.A. Pipe Cleaning Co., 601
S.W.2d 436, 438-39 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref’d n.r.e.).
          Boondoggles’ answer to Yancey’s petition shows that the meaning of the term
“net sales” was a crucial determination in this case. In its answer, Boondoggles
disputed Yancey’s method of calculating his bonus by maintaining that the bonus was
a function of net profit and not gross profit. Having disputed Yancey’s method,
Boondoggles had the burden to substantiate its proffered method, not only legally, but
also factually. See, e.g., Lone Star Gas Co. v. McCarthy, 605 S.W.2d 653, 656-57
(Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref’d n.r.e.) (construing meaning of
term propounded by appealing party’s interpretation under both the substantive law
and realities of oil and gas business). The trial court’s questions to Boondoggles
during closing argument clarify that Boondoggles did not meet that burden and even
conceded that it offered “no testimony whatsoever” to support its interpretation. 
Instead, Boondoggles relied on its legal contentions that net sales were necessarily
a function of net, rather than gross, profit; and that Yancey had agreed to a condition
precedent to performance of the contract that was consistent with that theory. As
addressed above, the latter contention has no merit. 
          Yancey, on the other hand, relied on three types of extrinsic evidence to clarify,
explain, and demonstrate that the term “net sales” meant sales after taxes, as follows: 
common usage of the term with that meaning by the corporation, State of Texas
records used to establish sales taxes that Boondoggles was obligated to pay, and
financial statements prepared for Boondoggles by an independent accounting firm. 
See Tex. Builders, 928 S.W.2d at 481; Warren Bros., 601 S.W.2d at 438-39. The trial
court agreed with Yancey, and, as we held above, the evidence was both legally and
factually sufficient to support the trial court’s finding. Because Yancey thus met his
burden by clarifying, explaining, and giving meaning to the disputed term and did not
attempt to vary or contradict the otherwise unambiguous terms of his contract, the
trial court did not err by stating, in its ninth conclusion of law, that the employment
contract was unambiguous. See Tex. Builders, 928 S.W.2d at 481; Warren Bros., 601
S.W.2d at 438-39. We overrule Boondoggles’ fifth point of error.
D.      Challenge to Admissibility of Testimony on Attorney’s Fees
          Boondoggles’ third point of error challenges the admissibility of Yancey’s
counsel’s testimony to support the trial court’s award of attorney’s fees. Boondoggles
contends that the trial court should have excluded the testimony and the time records
on which counsel relied because Yancey did not properly designate counsel as a
witness in response to Boondoggles’ request for disclosure. Because counsel’s
testimony was the only evidence offered in support of the $16,000 awarded to Yancey
as attorney’s fees, Boondoggles further contends that the award should be vacated. 
          The trial court’s evidentiary rulings are reviewable for abuse of discretion. 
Morrow v. H.E.B., 714 S.W.2d 297, 298 (Tex. 1986). A trial court abuses its
discretion when it acts arbitrarily or unreasonably and without reference to any
guiding rules or principles. Walker v. Packer, 827 S.W.2d 833, 839 (Tex. 1992). A
trial court has no discretion, however, in determining what the law is, which law
governs, or how to apply the law, and we therefore review those rulings de novo. See
Walker, 827 S.W.2d at 840; Phoenix Network Techs., Ltd. v. Neon Sys, Inc., 177
S.W.3d 605, 611 (Tex. App.—Houston [1st Dist.] 2005, no pet. h.). When we review
a discretionary ruling that results from the trial court’s having resolved underlying
facts, we must defer to the trial court’s factual resolutions and any credibility
determinations that may have affected those resolutions and may not substitute our
judgment for the trial court’s judgment in those matters. See Walker, 827 S.W.2d at
839–40. 
          Boondoggles relies on E.F. Hutton Co. v. Youngblood, 741 S.W.2d 363, 364
(Tex. 1987), in which the supreme court, interpreting former Tex. R. Civ. P. 215.5,
held that a party’s complete failure to disclose that its counsel would testify warranted
exclusion of counsel’s testimony as a sanction. This case, however, is governed by
Tex. R. Civ. P. 193.6. Rule 193.6 states that party who does not respond to a
discovery request to name a witness may not offer the testimony of a witness not so
identified, but further provides that the court may permit the testimony on finding
good cause or that the failure to respond timely will not unfairly surprise the
opponent. Tex. R. Civ. P. 193.6.
          Boondoggles is correct in contending that the record on appeal does not contain
a copy of Yancey’s response to Boondoggles’ request for disclosure. In accordance
with recent changes in the rules of discovery aimed at resolving storage problems by
reducing the amount of documents filed before trial, however, discovery responses
are not filed pretrial, but reserved until needed at trial. See Tex. R. Civ. P.
191.4(a)(2); Chris Griesel, The “New” Discovery Rules: Three Years Later Are
Old Dogs Learning New Tricks?, 15th Annual Advanced Evidence & Discovery
Course § VI(A)(4) at 6. In response to Boondoggles counsel’s objection that he had
not received the responses, Yancey’s counsel informed the trial court that his records
indicated that the response had been faxed to opposing counsel on October 21, 2003. 
As supplemented by Yancey, the record on appeal contains the certificate of written
discovery that Yancey’s counsel filed with the trial court on October 23, 2003 to
indicate that the response had been served on opposing counsel. This certificate
recites that Yancey had served the response to Boondoggles’ request for disclosure
two days earlier, but had not filed a copy with the court at that time, in compliance
with the rules. See Tex. R. Civ. P. 194.(a)(2). The record on appeal, as
supplemented, further establishes that Yancey properly designated his counsel as his
expert on attorney’s fees in February 2003, as follows: “He is plaintiff’s attorney. 
He is familiar with the reasonable and necessary fees and expenses in prosecuting
plaintiff’s claim.” 
          The award of attorney’s fees in this case is governed by Tex. Civ. Prac. &
Rem. Code Ann. § 38.001(8) (Vernon Supp. 2005), which authorizes the award of
reasonable attorney’s fees and costs to a party who prevails in an action for breach
of an oral or written contract. Section 38.001(8) is part of chapter 38 of the Civil
Practice and Remedies Code. Tex. Civ. Prac. & Rem. Code Ann. § 38.001–.006
(Vernon 1997). Section 38.003 of chapter 38 creates a rebuttable presumption that
the “usual and customary attorney’s fees” are reasonable for a chapter 38 claim. See
Tex. Civ. Prac. & Rem. Code Ann. § 38.003; Gen. Elec. Supply Co. v. Gulf
Electroquip, Inc., 857 S.W.2d 591, 601 (Tex. App.—Houston [1st Dist.] 1993, no
writ) (noting that section 38.003 presumption does not apply if reasonableness of fees
not controverted). Moreover, pursuant to section 38.004 of Chapter 38, a trial court
may take judicial notice—without receiving further evidence—not only of the usual
and customary attorney’s fees, but also of the contents of the court’s file. See Tex.
Civ. Prac. & Rem. Code Ann. § 38.004; Gill Sav. Ass’n v. Chair King, Inc., 797
S.W.2d 31, 32 (Tex. 1990); see also Purvis Oil Corp. v. Hillin, 890 S.W.2d 931, 939
(Tex. App.—El Paso 1994, no writ) (further holding that appellate court may presume
that trial court took judicial notice authorized by chapter 38); Holley v. Holley, 864
S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1993, no writ) (same). 
          Given the statutory framework of chapter 38, and the standards stated in rule
193.6 for permitting testimony upon an objection premised on allegations of lack of
compliance with a discovery request, and Yancey’s representations to the trial court
in response to Boondoggles’ objections, we conclude that the trial court properly
construed the governing principles of both chapter 38 and rule 193.6. See Walker,
827 S.W.2d at 840. We further conclude, on reviewing the record on appeal,
including the supplemental clerk’s record provided by Yancey, and deferring to the
determinations by the trial court that may have depended on credibility
determinations, that we cannot say that the trial court abused its discretion by
permitting Yancey’s counsel to testify and by overruling Boondoggles’ objections to
Yancey’s counsel’s relying on his billing records. 
          We overrule Boondoggles’ third point of error.
E.      Res Judicata Challenge
          In its sixth point of error, Boondoggles presents a two-pronged challenge to the
trial court’s sixth conclusion of law, which states that Yancey’s right to collection of
his indebtedness is not barred by res judicata.


 Although Boondoggles does not
challenge them specifically, we note further that the trial court’s findings of fact 15
through 17 state the following:
15.Case 1 was an equitable minority shareholder oppression case.
16.Case 2 (the instant case) is a breach of employment case.
17.Boondoggles Corp. was not a party in Case 1.

          Res judicata prevents parties and their privies from relitigating a cause of
action that has been finally adjudicated by a competent tribunal. Ingersoll-Rand Co.
v. Valero Energy Corp., 997 S.W.2d 203, 206 (Tex. 1999). Res judicata precludes
claims or defenses that, through diligence, should have been litigated in the prior suit
but were not; the doctrine is intended to prevent causes of action from being split and
thus to curb vexatious litigation and promote judicial economy. Id. at 207. Texas
applies the “transactional test” test to claims of res judicata. Barr v. Resolution Trust
Corp., 837 S.W.2d 627, 629-30 (Tex. 1992). To prevail on its claim of res judicata,
Boondoggles had to establish (1) a prior final judgment on the merits by a court of
competent jurisdiction, (2) identity of parties or those in privity with them, and (3) a
second action based on the same claims as were raised or could have been raised in
the first action. See id. at 629. 
          Boondoggles contends Yancey could have asserted his claims in the first suit,
the shareholder-oppression lawsuit (case 1) and that the majority shareholder-defendants in the first suit were in privity with Boondoggles, the defendant in the
second suit. Because Yancey did not assert his claims in the first suit, Boondoggles
contends that his claims are barred. 
          Determining whether Yancey’s breach-of-contract claim could have been
brought in the first suit requires an analysis of the factual basis of the respective
claims. See id. at 630. Analogizing the principles that control res judicata to those
that govern compulsory counterclaims, the supreme court has instructed that the
factors that will determine whether res judicata applies include the following: (1)
whether the claims sought to be barred arise out of the same transaction or occurrence
as the first suit and (2) whether those claims are against the opposing party in the
same capacity. See Ingersoll-Rand Co., 997 S.W.2d at 207; Gracia v. RC Cola 7-Up
Bottling Co., 667 S.W.2d 517, 519 (Tex. 1984) (holding that res judicata did not bar
suit by woman in individual capacity who had signed prior agreed judgment solely
in representative capacity as next friend of daughter); see also Guest v. Cochran, 993
S.W.2d 397, 405 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (distinguishing
claims brought by plaintiff in individual capacity from those brought by plaintiff in
capacity as coexecutor of estates).
          Reviewing the trial court’s conclusion de novo by applying these factors
demonstrates that Boondoggles cannot meet the second element of the Barr test. 
Yancey’s claims in this case do not derive from his capacity as a minority
shareholder, on which he relied in joining the remaining minority shareholders in the
shareholder-oppression action against the majority shareholders as individuals, but
from his initial, retained capacity as an employee of the Boondoggles
corporation—and not as an employee of the shareholder individuals. Boondoggles
thus fails to establish the identity of capacity required to demonstrate that this second
action is based on the same claims as were raised or could have been raised in the first
action. See Ingersoll-Rand Co., 997 S.W.2d at 207; Barr, 837 S.W.2d at 629.
          Having concluded that Boondoggles failed the identity-of-claims test, we need
not address its privity contentions. 
          We overrule Boondoggles’ sixth point of error.
Conclusion
          We affirm the judgment of the trial court.


 
Sherry Radack
                                                                        Chief Justice

Panel consists of Chief Justice Radack and Justices Taft and Nuchia.